[No. E000643. Fourth Dist., Div. Two. May 16, 1985.]

ANTHONY HULSEY, Plaintiff and Appellant, v.
ELSINORE PARACHUTE CENTER, Defendant and Respondent.

COUNSEL

Peggy Garrity and Gene Wilker for Plaintiff and Appellant.

McBreen & McBreen, Peter James McBreen and Ward D. Smith for Defendant and Respondent.

OPINION

McDANIEL, J.—In this appeal, we are called upon to review the propriety of a summary judgment entered for defendant in a sports risk case. The action in the trial court was to recover for personal injuries suffered by plaintiff at the time of his first parachute jump, one attempted under the auspices of defendant. At the hearing of the motion for summary judgment, no disputed issues of fact were raised in connection either with the count based on negligence or the count based on strict liability. As a consequence, the trial court was concerned generally with only two issues of law. One is whether the agreement and release of liability signed by plaintiff at the time of the instructional preparation for his first parachute jump is enforceable against him. The other is whether sport parachuting is an extra-hazardous activity such as precludes the effectiveness of the release. In our view, the trial court correctly ruled that the release is enforceable and that parachute jumping is not the kind of activity which precludes the valid use of the release procedure followed here by defendant.

### Synopsis of Trial Court Proceedings

After the case was at issue and defendant had taken plaintiff's deposition, defendant noticed a motion for summary judgment. The supporting papers

included the declaration of counsel for defendant, Peter James McBreen, the principal purpose of which was to authenticate certain documentary evidence he wished to place before the court: (1) Exhibit "A," a copy of plaintiff's deposition; (2) exhibit "B," a copy of the "Registration Card" signed by plaintiff several hours before he took off on his misadventure; and (3) exhibit "C," a copy of the "Agreement of Release of Liability," also signed by plaintiff at the same time he filled out the "Registration Card" on the reverse side.

As established by plaintiff's deposition, he went to defendant's place of business, the Elsinore Parachute Center (EPC), in the company of three friends, two of whom had had previous experience in sport parachuting. Upon arriving at EPC, plaintiff enrolled in the "First Jump Course" offered by defendant. Although plaintiff stated he had no recollection of filling out or signing the "Parachute Center Adult Registration Form," he did admit that the written inscriptions, the initials and the signature on the form were his.

Continuing, plaintiff also disclaimed any recollection of reading or signing the "Agreement & Release of Liability," but he did admit once again that the signature and the initials on the agreement were his. Plaintiff admitted that he voluntarily enrolled in the first-jump course and was not coerced in any way during the registration process.

After enrolling in the course and signing the items noted, plaintiff received a complete United States Parachute Association approved course of instruction in sport parachuting taught by an instructor certified by that association. This instruction consisted of about three hours of classroom training plus an additional hour of practical, clinical training.

During the classroom training, the instructor advised the class that students occasionally break their legs while jumping. In addition, canopy control was discussed and plaintiff received instruction on the proper procedure to be followed in maneuvering the parachute for landing. Plaintiff admitted that he understood the information provided and felt he was one of the better students in the class.

After the instructional phase of the course had been completed, plaintiff was issued a jumpsuit, boots, goggles, a harness with main and reserve parachutes, a helmet and a life vest. Plaintiff admitted that he had no problems with his equipment.

Plaintiff's actual jump was postponed several hours because of wind. At approximately 6:30 p.m., plaintiff boarded the aircraft for his first jump. Plaintiff recalled that the wind was "still" or "very calm" when he boarded the aircraft.

Plaintiff's exit from the aircraft was normal. Plaintiff testified that he attempted to steer toward the target area but was unable to reach it. Plaintiff attempted to land in a vacant lot but collided with electric power lines as he neared the ground. As he drifted into the wires, plaintiff saw a bright flash. Plaintiff's next recollection was of regaining consciousness on the ground. Despite the extreme risk to which he was thereby exposed, plaintiff sustained only a broken wrist.

As for other items before the court, exhibit "B" and exhibit "C," attached to Attorney McBreen's declaration, as already noted, are included herein as appendix. These items are copies of the registration card and the release reproduced here in actual size.

The written opposition to the motion for summary judgment was negligible. It consisted of the declaration of plaintiff's counsel, which stated that defendant was then a party to "several lawsuits alleging negligent conduct . . . ." Otherwise, the declaration attached excerpts of the same deposition which defendant brought before the court in its entirety. There was nothing else.

Consequently, as earlier noted, there were no issues of fact raised such as would have required denial of the motion. Thus, the trial court was faced with having to decide only issues of law. These issues were resolved in favor of defendant, and the motion was granted. A judgment reflecting this ruling was then entered, and this appeal followed.

### DISCUSSION

In pursuing his appeal, plaintiff makes four substantive contentions. They are that: (1) on the undisputed factual scenario there was no clear and comprehensive notice to plaintiff of what the legal consequences of the release would be; (2) such releases are against public policy; (3) the release is unenforceable because unconscionable in that it did not comport with plaintiff's reasonable expectations; and (4) parachute jumping is an ultrahazardous activity.

Before turning to a discussion of plaintiff's contentions, we note, in passing, that there are absolutely no infirmities in the record with respect to the summary judgment procedure by which the case was resolved in the trial court. The moving defendant, prima facie, made a definitive case for relief, and the opposing declaration wholly failed to raise a material issue of fact. (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) Thus, our review is confined to the propriety

of the legal determinations made by the trial court on the undisputed facts before it.

Otherwise, before proceeding to a discussion of the four issues of substance noted, we must also note in passing that we are not at all persuaded that plaintiff should be relieved of the legal consequences of the things he signed because he did not realize what he was signing or that somehow he was distracted or misled from a fair realization of what was involved. ■
It is well established, in the absence of fraud, overreaching or excusable neglect, that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it. (*Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 [131 Cal.Rptr. 882, 552 P.2d 1178]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) pp. 93-94.) On the record here, there is no indication whatsoever of fraud or other behavior by defendant which would otherwise have made the *Madden* rule inapplicable.

■   Another aspect of this preliminary inquiry into the circumstances surrounding plaintiff's filling out the registration card and signing the release involves the size of the type used in printing the release. In the case of *Conservatorship of Link* (1984) 158 Cal.App.3d 138 [205 Cal.Rptr. 513], the court held the purported exculpatory documents unenforceable for several reasons, including the fact that they were printed in five and one half point type and thus could not easily be read by persons of ordinary vision. (*Id.*, at pp. 141-142.) Actually, as observed in *Link*, "The five and one-half point print is so small that one would conclude defendants never intended it to be read . . . the lengthy fine print seems calculated to conceal and not to warn the unwary." (*Conservatorship of Link, supra,* 158 Cal.App.3d, 138, 141.)

The type size contained in *Link* is not present here. As appears from the actual size reproduction in the appendix, the release is in 10-point type, both caps and lower case letters. This size comports with a number of minimums prescribed by statute.[1]

---

[1] "Examples: Civil Code sections 1630 [eight to ten-point: parking lots]; 1677 [eight-point bold red or ten-point bold: liquidated damages provision in realty purchase contract]; 1803.1 and 1803.2 [eight to fourteen-point: retail installment sales]; 1812.85 [ten-point bold: health studio services]; 1812.205 and 1812.209 [ten to sixteen-point bold: seller assisted marketing plan]; 1812.302 and 1812.303 [ten-point bold: membership camping]; 1812.402 [ten-point: disability insurance]; 1861.8 [ten-point bold: innkeepers]; 1916.5 and 1916.7 [ten-point bold: loan of money]; 2924c [twelve to fourteen-point bold: mortgage default notice]; 2982.5 and 2983.2 [eight to ten-point bold: automobile sales finance]; 2985.8, 2986.2 and 2986.4 [six to ten-point bold: vehicle leasing act]; 3052.5 [ten-point bold: service dealer lien]." (*Conservatorship of Link, supra,* 158 Cal.App.3d 138, 141.)

As appears from a copy of the agreement reproduced in actual size and attached as an appendix, the second paragraph recites in bold-faced type: "I AM AWARE THAT PARACHUTE INSTRUCTION AND JUMPING ARE HAZARDOUS ACTIVITIES, AND I AM VOLUNTARILY PARTICIPATING IN THESE ACTIVITIES WITH KNOWLEDGE OF THE DANGER INVOLVED AND HEREBY AGREE TO ACCEPT ANY AND ALL RISKS OF INJURY OR DEATH. PLEASE INITIAL." Plaintiff affixed his initials.

The third paragraph recites that the subscriber will not sue EPC or its employees "for injury or damage resulting from the negligence or other acts, howsoever caused, by any employee, agent or contractor of [EPC] or its affiliates, as a result of my participation in parachuting activities." That paragraph goes on to recite that the subscriber will "release and discharge" EPC and its employees "from all actions, claims or demands . . . for injury or damage resulting from [the subscriber's] participation in parachuting activities."

The fourth paragraph, also in bold-faced type, recites that: "I HAVE CAREFULLY READ THIS AGREEMENT AND FULLY UNDERSTAND ITS CONTENTS. I AM AWARE THAT THIS IS A RELEASE OF LIABILITY AND A CONTRACT BETWEEN MYSELF AND ELSINORE PARACHUTE CENTER AND/OR ITS AFFILIATED ORGANIZATIONS AND SIGN IT OF MY OWN FREE WILL." Plaintiff's signature was thereto subscribed.

I

■ Plaintiff's first contention involves an inquiry into whether plaintiff could reasonably have been expected to understand its legal consequences for him. In substance, plaintiff argues that the agreement was not sufficiently explicit or unambiguous to be enforceable against him, citing us to *Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309 [195 Cal.Rptr. 90], and *Celli* v. *Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511 [105 Cal.Rptr. 904].

■ We first note, in dealing with this contention, that whether a contract provision is clear and unambiguous is a question of law, not of fact. (*Brant* v. *California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13].)

Getting back to the substantive issue, both *Ferrell* and *Celli* held that the releases challenged in those cases were not enforceable because the exculpatory provisions were not clear and explicit. ■ In *Ferrell,* the court said, "Such an agreement, read as a whole, must clearly notify the prospective releasor or indemnitor of the effect of signing the agreement."

(*Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd., supra,* 147 Cal.App.3d 309, 318.)[2]

Applying the rule quoted, *Ferrell* refused to enforce an exculpatory agreement between a race car driver and race sponsor. The operative language used in the agreement there in issue provided that the driver would "save harmless and keep indemnified" (*id.,* at p. 312) the race sponsor. The court reasoned that such language could not be reasonably expected to alert a layperson to the significance of the agreement and, therefore, that it was not sufficiently clear and explicit.

In contrast to the agreement in *Ferrell,* the one here was phrased in language clear to anyone. We have already quoted the pertinent provision, and it would be hard to imagine language more clearly designed to put a layperson on notice of the significance and legal effect of subscribing it. The flaws which the *Ferrell* court found in the agreement it had before it are not present here. Instead of disguising the operative language in legalese, the defendant prepared its agreement in simple, clear and unambiguous language understandable to any layperson. In sum, we hold that the language of the agreement here falls well within the *Ferrell* rule, i.e., that it was effectively drafted so as "clearly [to] notify the prospective releasor or indemnitor of the effect of signing the agreement." (*Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd., supra,* 147 Cal.App.3d 309, 318.

## II

■■ Turning to plaintiff's second contention, namely that releases of the type here used are against public policy, we note first that such agreements as this are arguably contemplated by section 1668 of the Civil Code. That section provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from the responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

---

[2]The *Ferrell* clause read in pertinent part as follows:

"RELEASE OF LIABILITY [¶] ENTRANTS ARE REQUIRED TO READ AND SIGN THE FOLLOWING DECLARATION.

"In consideration of the acceptance of this entry or of my being permitted to take part in this event, I, for myself, my heirs, executors, administrators, successors and assignes [*sic*] agree to save harmless and keep indemnified SNORE, Ltd., it's [*sic*] individual members and their respective agents, officers, officials, servants and representatives, the owner, curators, lessors, agencies, (including, but not limited to Federal, State, County and City), or managers of any lands upon which this event takes place from and against all actions, claims, costs and expenses and demands in respect of death, injury, loss of or damage to my person or property, howsoever caused, arising out of or in connection with my entry or my participation in this event, and notwithstanding that the same may have been contributed to, occasioned by, or directly caused by the negligence of the said bodies, their agents, officials, servants or representatives. . . ." (147 Cal.App.3d at p. 312.)

Whatever it proscribes, this section does *not* invalidate contracts which seek to except one from liability for simple negligence or strict liability. (*Mills* v. *Ruppert* (1959) 167 Cal.App.2d 58, 62-63 [333 P.2d 818].)

Civil Code section 1668 refers to limitations which are described as against the policy of the law. Such policy is the aggregate of judicial pronouncements on a given issue, and in this context deal with the concept characterized as "the public interest." This concept calls up for discussion *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].

*Tunkl* is a case in which the plaintiff signed an agreement that relieved the defendant hospital from liability for the wrongful acts of the defendant's employees. The plaintiff was required to sign the agreement to gain admission into the defendant's hospital. Thereafter, the plaintiff brought suit against the hospital claiming that he was injured as a result of the negligence of hospital employees. The trial court upheld the release. On appeal, the California Supreme Court invalidated the release agreement on the grounds that it affected the "public interest." ▇ The court set forth the following six factors which it deemed relevant in determining whether a contract affects the public interest: (1) It concerns a business of a type generally thought suitable for public regulation; (2) the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public; (3) the party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards; (4) as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services; (5) in exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence; (6) as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agent. (*Tunkl* v. *Regents of the University of California, supra,* 60 Cal.2d 92, 98-101.)

▇ Applying the *Tunkl* factors to the facts here, several distinctions are readily apparent. First, parachute jumping is not subject to the same level of public regulation as is the delivery of medical and hospital services. Second, the *Tunkl* agreement was executed in connection with services of great importance to the public and of practical necessity to anyone suffering from a physical infirmity or illness. Parachute jumping, on the other hand,

is not an activity of great importance to the public and is a matter of necessity to no one.

Finally, because of the essential nature of medical treatment, the consuming party in *Tunkl* had little or no choice but to accept the terms offered by the hospital. Defendant had no decisive advantage in bargaining power over plaintiff by virtue of any "essential services" offered by defendant. When referring to "essential services" the court in *Tunkl* clearly had in mind medical, legal, housing, transportation or similar services which must *necessarily* be utilized by the general public. Purely recreational activities such as sport parachuting can hardly be considered "essential."

In sum, measuring the transaction here against the *Tunkl* factors, we can see no logical reason for extending the "public interest" limitation on the freedom to contract to the exculpatory agreement here relied on by defendant.

There are no California cases directly on point dealing with exculpatory contracts in the context of high risk sports activities, but there are an ample number on the books in other states. *Jones* v. *Dressel* (Colo. 1981) 623 P.2d 370, a Colorado case, was decided on very similar facts by means of a summary judgment. The case is especially persuasive because the Colorado court relied extensively on *Tunkl* in arriving at its holding that the exculpatory agreement there relied upon by an operator of business furnishing sky diving facilities did *not* fall within the ambit of agreements proscribed as against the public interest. (*Id.*, at p. 377.)

Other out-of-state cases reaching the same result include: *Ciofalo* v. *Vic Tanney Gyms, Inc.* (1961) 10 N.Y.2d 294 [220 N.Y.S.2d 962, 177 N.Ed.2d 925] (swimming pool and health club); *Franzek* v. *Calspan Corp.* (1980) 78 App.Div.2d 134 [434 N.Y.S.2d 288] (white water rafting); *Solodar* v. *Watkins Glen Grand Prix Corporation* (1971) 36 App.Div.2d 552 [317 N.Y.S.2d 228] (auto racing); *Corpus Christi Speedway* v. *Morton* (Tex.Civ.App. 1955) 279 S.W.2d 903 (auto racing); *Gore* v. *Tri-County Raceway, Inc.* (M.D.Ala. 1974) 407 F.Supp. 489 (auto racing).

Accordingly, following both logic and the persuasive holdings cited from other jurisdictions, we hold that the exculpatory agreement here under discussion is not against the "public interest" so as to bring it within the prohibitions of section 1668 of the Civil Code because contrary to "the policy of the law."

### III

We come now to the narrower issue of whether the exculpatory contract here relied upon as an affirmative defense by defendant should not

be enforced because, as to plaintiff, it would be "unconscionable." This inquiry necessarily imports the more precise question of whether this contract was one of adhesion as a further ground to reject its enforcement.

Going back several decades, we can pick up a thread on this point which can be followed in the decisions. In *Neal* v. *State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690 [10 Cal.Rptr. 781], the court said, "[A contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." (*Id.*, at p. 694.) About 16 years later Justice Tamura of this court discoursed in depth on the subject in *Wheeler* v. *St. Joseph Hospital* (1976) 63 Cal.App.3d 345 [133 Cal.Rptr. 775, 84 A.L.R.3d 343], carrying the issue of enforceability beyond a matter of rote definition. He said, "However, a determination that a contract is adhesive is merely the beginning and not the end of the analysis insofar as enforceability of its terms is concerned. Enforceability depends upon whether the terms of which the adherent was unaware are beyond the reasonable expectations of an ordinary person or are oppressive or unconscionable. . . . [Citing cases.] A provision which limits the duties or liability of the stronger party will not be enforced against the forced adherent absent 'plain and clear notification' of the terms and an 'understanding consent' thereto. [Citing cases.]" (*Id.*, at p. 357.)

■   The marshalling of authorities on this point calls in *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165]. *Scissor-Tail* restated the rule as enforceable unless to do so would defeat judicial or legislative limitations on the right to contract freely. Such limitations, as noted, are: (1) that the agreement must not defeat the weaker party's reasonable expectations; and (2) the agreement must not be unconscionable. (*Id.*, at pp. 819-820.)

■   Applying the rule, the court in *Scissor-Tail* determined that a performing group's union contract with its promoter was adhesive, because the contract was a standard American Federation of Musicians' contract, *and* the promoter "was required by the realities of his business as a concert promoter to sign A.F. of M form contracts with *any* concert artist with whom he wished to do business . . . ." (*Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807, 818-819, original italics.)

Although the foregoing rule is now well established, its application to a contract used in the kind of activity here in issue is untried in California. As an a priori matter, however, it presents no difficulty. Plaintiff has made the picturesque if not ludicrous contention that he "was led to believe" that the urgent thing confronting him at the time he signed and initialed the

agreement was to sign up to purchase a photograph, and that as a consequence he did not realize the significance of the agreement when he signed it. He makes this contention despite the fact that his initials appear immediately adjacent to the capitalized words in bold-faced type, "AGREEMENT & RELEASE OF LIABILITY." It is hard to imagine that plaintiff, after having initialed the agreement in three places and signed it in one could have harbored any *reasonable* expectations other than what was unambiguously recited in the title and text of the agreement.

Because the agreement, in both its language and format, was not one which could even remotely operate to defeat the reasonable expectations of plaintiff and hence be unconscionable if enforced, we hold that it did not so operate and hence that its enforcement against him was not unconscionable.

## IV

That brings the discussion to plaintiff's fourth contention, namely, that parachute jumping is an extra-hazardous activity and that therefore, under rules applicable in such instances, defendant should be held accountable on the basis of strict liability. In addressing this contention, we note at the outset that whether an activity shall be classified as ultrahazardous is a question of law. (*Smith* v. *Lockheed Propulsion Co.* (1967) 247 Cal.App.2d 774, 785 [56 Cal.Rptr. 128, 29 A.L.R.3d 538].)

The modern theory of liability for ultrahazardous activity is that certain activities create such a serious risk of danger that it is justifiable to place liability for any resultant loss on the person engaging in the activity, regardless of lack of culpability on his part. (4 Witkin, Summary of Cal. Law (8th ed. 1974) § 799, p. 3096.)

A definition of ultrahazardous activity is found in *Luthringer* v. *Moore* (1948) 31 Cal.2d 489, 498 [190 P.2d 1], which provides as follows: "'An activity is ultra-hazardous if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of utmost care, and (b) is not a matter of common usage.'"

The California cases have routinely held that flying is not an ultrahazardous activity. (See *Southern Cal. Edison Co.* v. *Coleman* (1957) 150 Cal.App.2d Supp. 829 [310 P.2d 504].) Arguing by analogy, it can logically be concluded for the same reasons that the operation of a business like defendant's does not involve a risk of harm to persons or property which cannot be eliminated by the exercise of utmost due care. Actually, the critical risks are to the persons who choose to engage in the sport. If

parachutists could not control their direction of travel, if they had a tendency to land where they were unwanted, and in so doing would cause serious harm to others and their property, conceivably parachuting could be classified as ultrahazardous. However, that is not the pattern which prevails, as it does in the case of hot air ballooning; parachutists *can* direct their paths of travel and routinely land in small, targeted areas. All of this considered, the activity hardly falls within the *Luthringer* definition.

In other words, although parachute jumping is clearly dangerous, as clearly pointed out to plaintiff during the classroom instruction he received from defendant, it can be performed safely just as can skiing and white-water rafting. Otherwise, although not the most popular of sports, parachute jumping and sky diving are far from uncommon.

■ Alternatively, even assuming that parachuting were considered an ultrahazardous activity, plaintiff *does not fall within the class of persons* that doctrine is designed to protect. Strict liability is not absolute liability. That is significant because the Supreme Court of California has recently reaffirmed that plaintiff's assumption of the risk operates to bar his recovery based on a theory of strict liability. (*Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 375 [182 Cal.Rptr. 629, 644 P.2d 822].)

Either way, plaintiff's action as to the second count is also barred by reason of his subscribing this agreement.

### DISPOSITION

The judgment is affirmed.

Kaufman, Acting P. J., and Rickles, J., concurred.

APPENDIX
(actual size)

Exhibit "B" to McBreen Declaration

# PARACHUTING CENTER ADULT REGISTRATION FORM

LAST NAME _Holsey_  FIRST NAME _Anthony_  MIDDLE INITIAL _J_  AGE _23_  SEX _M_

PERMANENT ADDRESS _5530 W 190th St, #169_  PHONE _370-6454_

CITY _Torrance, CA._  STATE _CA._  ZIP CODE _90503_

OCCUPATION _Craftman_  DATE OF BIRTH _3/8/59_  DAY/MONTH/YEAR  WEIGHT _170_  HEIGHT _5'7"_

PRESENT ADDRESS _Same as above_

CITY ___  STATE ___  ZIP CODE ___  PHONE ___  I.D. _N569369_ U.S.P.A.

**How did you learn of the center?**  (Check Only One Please)

☐ Magazine Article  ☐ Lecture
☐ Sports Show (Which) ___  ☐ Other ___
☐ Yellow Pages Ad ___
☑ Friend (Name) _Steve Samson, Greg Pistole_
☐ Word of Mouth

**How Did You Travel To Center**
☐ Plane ☑ Car ☐ Bus ☐ Other ___

## MEDICAL STATEMENT FOR UNDERGOING PARACHUTE TRAINING AND JUMPING A J A.

I hereby certify that I am not aware of and am not under treatment for any physical infirmity or chronic ailment, or injury of any nature, and that I have normal vision or have corrective lenses, and that I have never been treated for any of the following:

1.) Cardiac or pulmonary condition or disease
2.) High or low blood pressure
3.) Fainting spells or convulsions
4.) Hard of hearing
5.) Nervous disorder
6.) Diabetes
7.) Kidney or related diseases

Signature _Anthony Scott Holsey_  Date _5/22/82_

**IMPORTANT — AFTER READING, SIGNING AND DATING THIS SIDE — TURN FORM OVER — READ AND COMPLETE OTHER SIDE**

■■■■■■■■■■■■■

APPENDIX
(actual size)

Exhibit "C" to McBreen Declaration

## AGREEMENT & RELEASE OF LIABILITY  *A.I.H.*

I, __Anthony Hulsey__, *A.I.H.*, HEREBY ACKNOWLEDGE that I have voluntarily applied to participate in parachuting instruction and training, culminating in a parachute jump at the premises of Elsinore Parachute Center.

I AM AWARE THAT PARACHUTE INSTRUCTION AND JUMPING ARE HAZARDOUS ACTIVITIES, AND I AM VOLUNTARILY PARTICIPATING IN THESE ACTIVITIES WITH KNOWLEDGE OF THE DANGER INVOLVED AND HEREBY AGREE TO ACCEPT ANY AND ALL RISKS OF INJURY OR DEATH. PLEASE INITIAL  *A.I.H.*

AS LAWFUL CONSIDERATION for being permitted by Elsinore Parachute Center or one of its affiliated organizations to participate in these activities and use their facilities, I hereby agree that I, my heirs, distributees, guardians, legal representatives and assigns will not make a claim against, sue, attach the property of, or prosecute Elsinore Parachute Center, Parachutes, Inc., and or one of its affiliated organizations, and Aurora Leasing Company, and Orange Sport Parachuting Center, Inc., and Lakewood Sport Parachuting Center, Inc. for injury or damage resulting from the negligence or other acts, howsoever caused, by any employee, agent or contractor of Elsinore Parachute Center or its affiliates, as a result of my participation in parachuting activities. In addition, I hereby release and discharge Elsinore Parachute Center, Parachutes, Inc., Skydive, Skydive II, and its affiliated organizations, and Aurora Leasing Company, and Orange Sport Parachuting Center, Inc., and Elsinore Sport Parachuting Center, Inc., and Lakewood Sport Parachuting Center, Inc. from all actions, claims or demands I, my heirs, distributees, guardians, legal representatives, or assigns now have or may hereafter have for injury or damage resulting from my participation in parachuting activities.

I HAVE CAREFULLY READ THIS AGREEMENT AND FULLY UNDERSTAND ITS CONTENTS. I AM AWARE THAT THIS IS A RELEASE OF LIABILITY AND A CONTRACT BETWEEN MYSELF AND ELSINORE PARACHUTE CENTER AND/OR ITS AFFILIATED ORGANIZATIONS AND SIGN IT OF MY OWN FREE WILL.

DATED: _5/22/_

SIGNATURE _Anthony Scott Hulsey_

WITNESS _Rebecca Avila_

DATE _5/22/8?_