[No. C038663. Third Dist. Dec. 30, 2002.]

JOSEPH PLATZER, a Minor, etc., et al., Plaintiffs and Appellants, v. MAMMOTH MOUNTAIN SKI AREA, Defendant and Respondent.

## COUNSEL

Law Offices of Robert E. Schroth and Robert E. Schroth for Plaintiffs and Appellants.

Lauria, Tokunaga & Gates and Mark D. Tokunaga for Defendant and Respondent.

## OPINION

**CALLAHAN, J.**—Eight-year-old Joseph Platzer (Joseph) was injured when he fell from the J-6 chairlift during a ski lesson at June Mountain Ski Area (June Mountain) in December 1998. Dagmar Platzer (Dagmar), Joseph's mother and guardian at litem, sued Mammoth Mountain Ski Area (Mammoth), June Mountain's corporate operator, for damages on Joseph's behalf. The court granted Mammoth's motion for summary adjudication, and dismissed all causes of action based on negligence. Thereafter, the trial jury returned a verdict in favor of Mammoth on the issue of gross negligence.

In this appeal from the judgment, Joseph contends the court erred in granting Mammoth's motion for summary adjudication. He challenges the

implied finding that a release signed by his mother barred all claims for simple negligence against Mammoth, a common carrier. Joseph also maintains the court erred in admitting the release at trial, and instructing the jury that ordinary negligence was inapplicable to the case. We affirm the judgment.

I

*The Release*

On December 30, 1998, Dagmar enrolled Joseph in the June Mountain Sports School. She signed a document entitled "Release of Liability and Medical Authorization" which read in relevant part:

"I have enrolled the afore-named child or children ('Child') in the program ('Program'). I understand the Child's participation in the Program involves exposure to the inherent risks of skiing and/or snowboarding that cannot be eliminated. I also understand that the Child's participation in the Program may require the use of ski lifts and that the Child may ride lifts alone, with other guests or with other children and that the use of lifts by the Child involves a potential risk of injury.

"Individually and as the parent or guardian of the Child, I HEREBY EXPRESSLY ASSUME ALL RISKS associated with the Child's participation in the Program including all risks associated with skiing and/or snowboarding, riding the lifts and skiing/snowboarding on terrain or using equipment intended to improve or enhance the Child's skiing/snowboarding skills.

"Despite my understanding of the foregoing risks, I, individually and as the parent or legal guardian of the Child, AGREE NOT TO SUE AND TO RELEASE FROM LIABILITY AND TO DEFEND, INDEMNIFY AND HOLD HARMLESS MAMMOTH/JUNE SKI RESORT and their representatives, owners, employees and agents for any damage or injury arising out of the Child's participation in the Program regardless of the cause, including NEGLIGENCE. [¶] . . . [¶]

"I understand that the foregoing is a LIABILITY RELEASE and a MEDICAL AUTHORIZATION that is legally binding on me, the Child, our heirs and our legal representatives and I sign it of my own free will. I acknowledge that the foregoing is binding during the 1998-1999 ski season."

II

*Summary Adjudication of Claims Based on Ordinary Negligence*

Mammoth moved for summary judgment based on the release signed by Dagmar. The parties later stipulated that Mammoth's motion would be

deemed a motion for summary adjudication, and Joseph filed an amended complaint alleging gross negligence by Mammoth as a common carrier. The court granted the motion for summary adjudication. ▆ On appeal, Joseph maintains that Mammoth cannot contract away its liability for ordinary negligence, and the release is void as against public policy.

The trial court shall grant defendant's motion for summary adjudication "only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Code Civ. Proc., § 437c, subd. (f).) We review the trial court's ruling de novo (*Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1727 [22 Cal.Rptr.2d 781] (*Westlye*)), and conclude there was no error.

The dispositive question in this appeal is whether the release signed by Dagmar absolved Mammoth of liability for ordinary negligence. Citing *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693] (*Tunkl*) and Civil Code section 1668,[1] Joseph argues that regardless of the language of Civil Code section 2175,[2] contracts purporting to exempt common carriers from liability for negligence are void as being against public policy. Mammoth counters by citing a maxim of statutory construction: *"Expressio unius est exclusio alterius:* The mention of one thing implies the exclusion of another." It reasons that the Legislature's reference to gross negligence—but not ordinary negligence—in Civil Code section 2175 means it intended to exclude ordinary negligence from the purview of the statute. As these arguments suggest, the resolution of this appeal requires our consideration of two lines of cases—those involving Civil Code section 2175 and releases dealing with common carriers, and those involving releases void under *Tunkl* and Civil Code section 1668 as against public policy.

"Every one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." (Civ. Code, § 2168.) Common carriers for reward "must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." (Civ. Code, § 2100.) There is no dispute chairlift operators like Mammoth are common carriers. (*Squaw Valley Ski Corp. v.*

---

[1] Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

[2] Civil Code section 2175 states that "[a] common carrier cannot be exonerated, by any agreement made in anticipation thereof, from liability for *the gross negligence, fraud, or willful wrong of himself or his servants*." (Italics added.)

*Superior Court* (1992) 2 Cal.App.4th 1499, 1508 [3 Cal.Rptr.2d 897] (*Squaw Valley*).)

■ "At common law a common carrier might make any other contract relative to the carriage of property intrusted to it, save one exempting it from liability for any kind of negligence. This rule was founded upon considerations of public policy, it being deemed derogatory thereto to allow a common carrier to contract against its own negligence, because to permit this had a tendency to promote negligence. *But, as far as ordinary negligence is concerned, the rule at common law has been abrogated by our code* (sec. 2174)[3] *to the extent that the shipper and carrier may now contract for the purpose of limiting the liability of the latter therefor.* The prohibition of the common law against a carrier limiting his liability for any kind of negligence is declared in this state by section 2175 only to apply to the limitation for gross negligence." (*Donlon Bros. v. Southern Pacific Co.* (1907) 151 Cal. 763, 770 [91 P. 603], italics added; see also *Walther v. Southern Pacific Co.* (1911) 159 Cal. 769, 772-773 [116 P. 51].) ■ Mammoth is correct that nothing in Civil Code sections 2174 and 2175 prevented it from negotiating a release from liability for ordinary negligence.

The next question is whether public policy bars enforcement of such a release. ■ In *Tunkl*, a case arising under the more general contract provisions of Civil Code section 1668, the Supreme Court considered the validity of a release from liability for future negligence imposed as a condition for admission to the University of California Los Angeles Medical Center, a charitable research hospital. (*Tunkl, supra,* 60 Cal.2d at p. 94.) It concluded that "an agreement between a hospital and an entering patient affects the public interest and that, in consequence, the exculpatory provision included within it must be invalid under Civil Code section 1668." (*Ibid.*) Of interest here is the Supreme Court's description of the types of transactions that involve the public interest. An "attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

[3]Civil Code section 2174 reads: "The obligations of a common carrier cannot be limited by general notice on his part, but may be limited by special contract."

In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Id.* at pp. 98-101, fns. omitted.)

California courts have consistently declined to apply *Tunkl* and invalidate exculpatory agreements in the recreational sports context. (*Westlye, supra,* 17 Cal.App.4th at pp. 1734, 1735 [adjustment of ski bindings]; see also *Hulsey v. Elsinore Parachute Center* (1985) 168 Cal.App.3d 333, 343 [214 Cal.Rptr. 194] [parachute jumping] (*Hulsey*).) The *Hulsey* court distinguished parachute jumping from activities that *Tunkl* and its progeny have found to affect the public interest. "First, parachute jumping is not subject to the same level of public regulation as is the delivery of medical and hospital services. Second, the *Tunkl* agreement was executed in connection with services of great importance to the public and of practical necessity to anyone suffering from a physical infirmity or illness. Parachute jumping, on the other hand, is not an activity of great importance to the public and is a matter of necessity to no one. [¶] Finally, because of the essential nature of medical treatment, the consuming party in *Tunkl* had little or no choice but to accept the terms offered by the hospital. . . . Purely recreational activities such as sport parachuting can hardly be considered 'essential.' " (*Hulsey, supra,* at pp. 342-343.)

The court in *Okura v. United States Cycling Federation* (1986) 186 Cal.App.3d 1462 [231 Cal.Rptr. 429] (*Okura*) distinguished bicycle racing in a similar manner. "Measured against the public interest in hospitals and hospitalization, escrow transactions, banking transactions and common carriers, this transaction is not one of great public importance. There is no compelling public interest in facilitating sponsorship and organization of the leisure activity of bicycle racing for public participation. The number of participants is relatively minute compared to the public use of hospitals, banks, escrow companies and common carriers. Also, the risks involved in running such an event certainly do not have the potential substantial impact on the public as the risks involved in banking, hospitals, escrow companies and common carriers. The service certainly cannot be termed one that 'is often a matter of practical necessity for some members of the public.' (*Tunkl* . . . , *supra,* 60 Cal.2d at p. 99.)" (*Okura, supra,* at p. 1467.)

Defendant Mammoth is a common carrier in the recreational sports setting. One fact favors enforcing the release, the other does not. We conclude the release is effective for two reasons.

First, Civil Code sections 2174 and 2175 govern release agreements affecting the liability of common carriers. Civil Code section 1668 speaks more generally to contracts that "exempt *anyone* from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, . . ." (Italics added.) A specific statute on a subject controls over a general provision. (Code Civ. Proc., § 1859; *Div. of Labor Law Enforcement v. Moroney* (1946) 28 Cal.2d 344, 346 [170 P.2d 3]; *Kennedy v. City of Ukiah* (1977) 69 Cal.App.3d 545, 552 [138 Cal.Rptr. 207].) Accordingly, Civil Code sections 2174 and 2175 govern the release at issue here.

Second, although Mammoth's chairlift operations fit the statutory definition of common carrier (Civ. Code, § 2168; *Squaw Valley, supra,* 2 Cal.App.4th at pp. 1507-1508), it differs from the typical common carriers—airlines, railroads, freight lines—in significant ways. "Skiing, like other athletic or recreational pursuits, however beneficial, is not an essential activity." (*Olsen v. Breeze, Inc.* (1996) 48 Cal.App.4th 608, 621-622 [55 Cal.Rptr.2d 818].) Public Utilities Code section 212, subdivision (c) expressly excludes chairlift operators from regulation by the Public Utilities Commission. (*Squaw Valley, supra,* 2 Cal.App.4th at pp. 1511-1512.) We already explained that courts routinely exclude recreational sports from the purview of *Tunkl,* concluding that such activities are not of great public importance or practical necessity. (See *Westlye, supra,* 17 Cal.App.4th at pp. 1734, 1735; *Okura, supra,* 186 Cal.App.3d at p. 1467; *Hulsey, supra,* 168 Cal.App.3d at pp. 342-343.)

III

*Admission of the Release at Trial*

Joseph argues the court erred in admitting the release into evidence over his objection, but fails to cite the grounds for his objection at trial, or explain how he was prejudiced by admission of that evidence. On appeal he states in general terms that the release was irrelevant and highly prejudicial once the court ruled that the release exonerated Mammoth from ordinary negligence. He declares in conclusionary fashion that "[t]he only value the release had at trial was to the defendant, who used it to the prejudice of the Plaintiff."

"Where inadmissible evidence is offered, the party who desires to raise the point of erroneous admission on appeal must object at the trial, specifically stating the grounds of the objection, and directing the objection to the particular evidence that the party seeks to exclude. . . . [F]ailure to object at all waives the defect." (3 Witkin, Cal. Evidence (4th ed. 2000)

Presentation at Trial, § 371, pp. 459-460.) The reporter's transcript indicates that Joseph's counsel objected to admission of the release, and the court overruled the objection. However, neither the reporter's transcript nor the clerk's transcript reveals the grounds for his objection, or confirms he objected on grounds of relevancy. Joseph "must affirmatively show error by an adequate record." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 518, p. 562.)

However, even if we were to assume Joseph preserved his evidentiary objection for consideration on appeal, we conclude the release was relevant to the issue of gross negligence. Among other things, it described the inherent risks of skiing and using the ski lifts. The court did not abuse its discretion in admitting the release into evidence.

## IV

### *Jury Instructions on Gross Negligence*

Joseph also contends the court erred in instructing the jury "that ordinary negligence was inapplicable in this case and that plaintiff would have to prove Defendant was guilty of gross negligence." In light of our conclusion the trial court did not err in granting Mammoth's motion for summary adjudication and dismissing all causes of action based on ordinary negligence, we reject Joseph's claim of instructional error.

### DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Morrison, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 9, 2003.