ERCK, Respondent, v. BACHAND, Appellant

(10 N. W.2d 518.)

(File No. 8572. Opinion filed July 23, 1943.)

O'Keeffe & Stephens and R. S. Riter, all of Pierre, for Defendant and Appellant.

Morrison & Skaug, of Mobridge, for Plaintiff and Respondent.

SMITH, J. Mae Erck was killed as the result of a collision between an automobile driven by her husband, Louis Erck, and an oil truck driven by defendant A. J. Bachand. Thereafter the husband was appointed special administrator of the estate of Mae Erck, deceased, and brought this action under SDC chapter 37.22 to recover damages for her wrongful death. As the Ercks were without children, the action was brought for the sole and exclusive benefit of Louis Erck. It resulted in a judgment below for plaintiff in a substantial sum. By way of defense, the answer alleged that Louis Erck had executed and delivered to defendant a release in writing absolving him of all liability in the premises. At the trial plaintiff sought to prove that his signature to the release was procured by duress. The trial court instructed the jury as follows: "As the court has pointed out to you in Instruction No. 1, testimony and evidence has been submitted to you relating to a release of liability wherein the plaintiff undertook to absolve the defendant and the Hardware Mutual Casualty Company from liability upon any claim for damages the plaintiff might have then or thereafter asserted against the defendant and said company or

either of them. You are instructed that if you find from the testimony in this case that the release received in evidence, which release you will have in your jury room, was obtained from the plaintiff by means of duress or intimidation and that the same was not voluntarily executed by him, you shall wholly disregard said document in arriving at your verdict. If, on the other hand, you shall find from the testimony submitted that the release of liability was voluntarily signed by the plaintiff and that the execution thereof by him was not brought about by the use of duress or intimidation, it shall be your duty to return a verdict in favor of the defendant." Upon a motion for new trial, defendant assailed the verdict on the ground that the evidence was insufficient to show that the release was procured by duress, and has assigned the overruling of his motion for new trial as error.

As background to the consideration of this issue we reproduce plaintiff's statement of facts dealing with the immediate circumstances of the collision:

"About one o'clock P. M., on a clear day they (plaintiff and wife) came to a point about 24 miles west of Lead where the road turns sharply to the left and down an incline for about 600 feet. Plaintiff approached this portion of the road at a speed of 15 to 20 miles per hour with brakes in good working condition but found, upon making the turn, that the road was icy and slippery and his car started to slip, slide, and skid. Plaintiff did everything possible to control the car, applied the brakes and tried to keep it on the right-hand side of the road. But as it moved down the incline it became entirely unmanageable and after slipping and sliding from one side of the road to the other for a distance of about 150 feet one front wheel struck some exposed gravel which caused the car to swing around and over to the left side of the road with the front end of the car pointing in the opposite direction. Making the turn when the car started to skid and slide Erck and Sanders saw defendant, Bachand, coming up the incline toward them over 600 feet away. Bachand, at the same point, saw them

and observed the Erck car when it started to slip, skid and swerve and then sensed danger.

"Bachand was coming from the opposite direction up grade. He was driving a heavy oil truck with dual wheels which he could stop on such incline within 40 feet. He was acquainted with the highway and its condition at this curve and incline by traveling over it that forenoon and also daily for several years in hauling oil from a Wyoming refinery to his station at Sturgis. He knew of the caution sign at the foot of this incline. He was traveling at 40 or more miles per hour when he first saw Erck's car in peril at the curve.

"Bachand observed the Erck car slipping, skidding and swerving from side to side on the highway and out of control as it traveled about 150 feet down the incline. He did not slacken his speed but was driving and crowding his truck at 45 or 50 miles per hour to make the hill. Erck's car turned directly around in the opposite direction going up grade on the right-hand side of the highway where the accident occurred. Bachand was then traveling at a higher rate of speed than when he first observed Erck's car. When practically upon Erck's car he sharply turned off the highway to the right. His speed was then such as to force the right front wheel of this heavy truck up over a 4-foot embankment. The truck stopped and then rebounded back and sideways to the highway into and against Erck's car. A heavy plank railing on the side of the truck struck and crushed the rear end of the automobile where sat Mrs. Erck who was killed almost instantly."

The collision occurred on March 6, 1941. Burial took place in eastern South Dakota on March 10th, and plaintiff returned to his home in Sturgis on the 15th of March. Thereafter, in the office of an attorney, other than those of record in the proceedings on appeal, plaintiff signed a statement of the circumstances surrounding the collision. This statement is dated March 22, 1941. He was then advised that the attorney represented the Hardware Mutual Casualty Company. On or about March 29, 1941, at about 10:30

P. M. that attorney called at plaintiff's home. According to plaintiff "* * * he came in and I gave him a chair and he sat down and then he asked me if I had any liability insurance and I said. No, that she had $1000 life insurance, so he said, 'By the way, the insurance company has written me and it looks like they might want to sue for the damage to their truck which is a small amount of about $250.' I said, 'I think if any body has any damages coming I am the looser,' and he said 'you brought on the whole thing, you know, and the insurance company can put a manslaughter charge against you,' and I said I didn't feel like fighting anything; that I lost my wife and my dad is about ready to pass on, and he says, 'I will see you; I think I can fix it up.' " On April 10, 1941, while plaintiff was in a Sturgis store the attorney came in and said: " 'Let's come up to my office for a little bit; I want to see you,' and I said I would be up in a little while, and in 15 minutes or so I went up to his office. * * * He had that paper there, and he said 'I wonder if you will sign this here; that will settle everything between you and Bachand and the insurance company and we will drop the manslaughter charge on it' so he handed it to me. * * * I went out there and I started reading and I couldn't get anything out of it. The first party said this and the third party said that, and I never read it, I just sat and looked at it and I couldn't get any sense out of it, and he finally come in and I sat and looked at him a while and then he handed me a pen and I signed it. I believed what he told me at my house ten days before. I had known of his ability and standing as a good lawyer and relied on what he said. I know I would not have signed it if it wasn't for the representations he made."

The attorney in question denies that manslaughter was mentioned or thought of in connection with his conferences with plaintiff.

The instrument in question describes the collison, the damage to plaintiff's car, the resulting death of Mae Erck, the damage to defendant's truck, and the fact that the Hardware Mutual Casualty Company carried collision and

public liability insurance on the truck and had made payment of the damage thereto, and contained a mutual agreement of waiver and release of all claims by plaintiff, defendant and the insurance company.

 "An obligation is extinguished by a release therefrom given to the debtor by the creditor, upon a new consideration, or in writing, with or without new consideration." SDC 47.0240. Such an instrument is contractual in nature, 53 C. J. 1196, and the principles which govern in determining whether consent to a contract is real or only apparent are applicable here. Consent to a contract is not real and is voidable when obtained through duress. SDC 10.0303. That threats of prosecution for crime fall within the embrace of the statutory definition of duress appearing as SDC 10.0305 is settled. Cochrane v. Nelson et al., 45 S. D. 609, 189 N. W. 700; Greenfield v. Eberle, 48 S. D. 75, 202 N. W. 291; Daum v. Urquhart, 61 S. D. 431, 249 N. W. 738; Meylink v. Minnehaha Co-op. Oil Co., 66 S. D. 351, 283 N. W. 161. To avoid the apparent reality of a consent on the ground that it was coerced by such threats, it must be made to appear by clear and satisfactory evidence that the free agency and will of the mind which manifested an assent was in fact overcome. Meylink v. Minnehaha Co-op. Oil Co., supra. It has been well said: "There is no legal standard of resistance with which the person acted upon must comply at the peril of being remediless for a wrong done to him, and no general rule as to the sufficiency of facts to produce duress. The question in each case is, Was the person so acted upon by threats of the person claiming the benefit of the contract, for the purpose of obtaining such contract, as to be bereft of the quality of mind essential to the making of a contract, and was the contract thereby obtained? Hence, under this theory duress is to be tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim." 17 Am. Jur. 884.

 Although this modern view, which tests the efficacy of the evil devices of the wrongdoer by the state of mind actually produced in the particular individual at which

they were directed, rather than by their probable effect upon an abstract or standard person of ordinary courage and firmness of mind, has liberalized the law of duress, we do not understand that it offers support to verdicts or findings which rest on speculation. It has not modified the rule which requires the ultimate inference of consent through duress to rest on substantial circumstances from which reasonable minds functioning reasonably can conclude that the apprehension of the victim was real, and that his consent was thereby coerced. 13 C.J. 400; 17 C.J.S., Contracts, § 172. Black on Rescission and Cancellation, 2d Ed., § 234.

As a place of beginning, in analyzing the record, we turn to the man. Erck was 44 years of age and had spent the past 14 years in work as a carpenter. The extent of his schooling and business experience is not revealed. That he is a man of at least ordinary intelligence is made manifest by his testimony. In fact, that he is not without native shrewdness is demonstrated by the manner in which he withstood the cross-examination of experienced counsel. We do not overlook the fact that action in which plaintiff took part resulted in the death of his beloved mate, and that therefore, at the time in question, his mind, conditioned as it was by grief, was perhaps more than ordinarily susceptible to coercion. A month had elapsed, however, before the release was executed. It is apparent from the circumstances of the collision that neither intention nor recklessness on Erck's part contributed to the death of his wife. If he considered himself blameworthy, and he has steadfastly contended that he was not, it would be unreasonable to assume that he was conscious of any sense of criminal guilt. We do not think the inference that he was susceptible to coercion because of a sense of guilt is warranted by the facts.

Turning from the state of his mind at the time it received the impact of the alleged threats, we examine the statements of the attorney as they were related by plaintiff. The direct threat was of a civil suit to recover $250. Annexed thereto was a subtle suggestion that the insurance com-

pany could have him charged with manslaughter. That such a suggestion, whether express or implied, may effectively coerce a mind has been recognized. Cochrane v. Nelson et al., supra. To have that effect, reason tells us that it must be accompanied by some show of present intention. The suggestion of a mere possibility will seldom, if ever, overcome a mind. All of the background and circumstances we have related indicate the intrinsic weakness of the threat. Plaintiff was not thereby confronted with imminent danger of prosecution.

There then followed a period of eleven days, during which, according to the record, there was no contact between plaintiff and the attorney and during which plaintiff's opportunity for calm reflection and consultation with friends and advisors was complete. As to his conduct and state of mind during that period, the record is silent. At the end of that period, he was handed the form of release, its contents were truly represented, and with a reiteration of the threat of criminal charge in words as follows: "and we will drop the manslaughter charge," he was asked to sign. After an opportunity to read the instrument, plaintiff attached his signature thereto and made delivery thereof.

The bargain he made is next examined. The character of bargain made has a logical bearing on the issue of coercion. In return for release from a questionable small liability he gave up what, because the collison occurred on plaintiff's left-hand side of the road, must have seemed to him an equally questionable cause of action of larger dimensions, and thereby freed himself from all litigation. It cannot be said that the bargain is not such as reason might have dictated.

Finally, we turn to the reason plaintiff gave for executing the release. He said in substance that he knew of the lawyer's reputation, believed what he had said ten days before, and would not have executed the release but for that belief. He further says that he failed in his attempt to read the release because he became confused by its phrasing. He fails utterly to state that the statements made by counsel

which he believed generated a fear or apprehension in his mind.

The most that reason can extract from all of this evidence is that the statements of counsel influenced plaintiff's decision. But the issue submitted to the jury, and on which there was a determination adverse to defendant, was as to whether the release resulted from coercion and intimidation. We are persuaded that an inference that the free will and mind of plaintiff was overcome by threats is not warranted by this meager evidence. In fact, there is no evidence that plaintiff's mind was even disturbed by apprehension.

Contractual relationships would be placed upon a very infirm basis if they were to become vulnerable to attacks grounded on such a partial showing of the elements of duress. We hold the evidence insufficient to support the verdict.

In arriving at this conclusion we have not failed to consider the cases cited by respondent. It is significant that able counsel have been forced to rely upon cases grounded on fraud. We consider them inapposite here. The issue submitted to and decided by the jury was whether the release resulted from coercion and intimidation.

The conclusion we have reached forecloses consideration of the remaining assignments.

The order and judgment of the learned trial court are reversed.

ROBERTS, P.J., and POLLEY and RUDOLPH, JJ., concur.

WARREN, J., concurs in reversal.