## 36585. DOSTER v. C. V. NALLEY, INC., *et al.*

DECIDED MAY 13, 1957—REHEARING DENIED JUNE 6, 1957.

864

*Tifton S. Greer, Joseph G. Collins*, for plaintiff in error.

*Ben J. Camp, Telford, Wayne & Smith, Wheeler Robinson & Thurmond*, contra.

FELTON, C. J. █ The plaintiff in error concedes in his brief that the evidence did not disclose any negligence on the part of the Southern Racing Enterprises, Inc.

█ (a) The contract entered into between the plaintiff and the defendants Southern Racing Enterprises, Inc., and Gainesville Speedway, Inc., bars a recovery against either of such defendants. There can be a "release" of future or contingent claims. 45 Am. Jur. 695, Release, § 31; *Hearn* v. *Central of Ga. Ry. Co.*, 22 *Ga. App.* 1, 7 (95 S. E. 368); *McCommons* v.

*Greene County,* 53 *Ga. App.* 171, 174 (184 S. E. 897). While in some cases such an instrument has been called a release, we rather think that it actually constitutes a covenant not to sue. "It is apparent from this amended answer that the pleader considered this pass a release, and that the release of the Pennsylvania Railroad Company released as a joint tortfeasor the Pennsylvania Tunnel & Terminal Railroad Company. This was the ground of the decision below. In our opinion this view is untenable. The pass had none of the elements of a release. It was an agreement not to sue, made in consideration of the free use of railroad facilities. There was no claim in existence to be released at the time it was given. It spoke for the future, not the present or ast. No liability existed, consequently there was none to be released. This contract, therefore, made on sufficient consideration with the Pennsylvania Railroad Company, did not apply to a joint tortfeasor, unless the contract expressly or by implication so provided. [Citations]." Wilder *v.* Pennsylvania R. Co., 245 N. Y. 36 (156 N.E. 88, 52 A.L.R. 188). Being a covenant not to sue rather than a release, it does not operate to release other joint tortfeasors. Assuming that the instrument is a release, it is not the kind of release which would release joint tortfeasors. Such a release must come after the cause of action has arisen and operates to discharge other joint tortfeasors on the theory that there can be but one satisfaction, and that there has been a complete accord and satisfaction. See *Edmondson* v. *Hancock,* 40 *Ga. App.* 587 (151 S. E. 114); *Caplan* v. *Caplan,* 62 *Ga. App.* 577 (9 S. E. 2d 96); *Moore* v. *Smith,* 78 *Ga. App.* 49 (1) (50 S. E. 2d 219); *Giles* v. *Smith,* 80 *Ga. App.* 540 (56 S. E. 2d 860).

(b) The contract or covenant not to sue inured to the benefit of Gainesville Speedway, Inc., as well as Southern Racing Enterprises, Inc. The agreement was as follows:

"Southern        Southern Racing Enterprises, Inc.
Speed          Thrills            Release
    Racing
    Enterprises    Gainesville Speedway Inc. Speedway

"In consideration of receiving permission from the promoters to enter upon the premises of this speedway, the receipt of such

permission being hereby acknowledged, and in further consideration of receiving permission to participate, when qualified, either as a driver, mechanic, owner, attendant, or in any other capacity, in any race held at these premises, the receipt of such permission being also hereby acknowledged, each of the undersigned hereby releases S. R. E. the licensed promoter, and its agents, officers, servants, and employees, of and from any and all liability, claims, demands, actions, and causes of action whatsoever, arising out of or related to any loss, damage, or injury, including death, that may be sustained by any or each of the undersigned, or any property of any or each of the undersigned, while in, on, or upon these premises, or any premises leased to, owned by, sanctioned by, or under the control or supervision of S. R. E. or enroute to or from these premises, or any other premises leased to or under the control or supervision of S. R. E.

"Each of the undersigned being duly aware of the risks and hazards inherent upon entering upon said premises and or in participating in any races held at said premises, hereby elects voluntarily to enter upon said premises, knowing their present condition and knowing that said condition may become more hazardous and dangerous during the time that each of the undersigned is upon the said premises. Each of the undersigned hereby voluntarily assumes all risks of loss, damage, or injury, including death, that may be sustained by any or each of the undersigned, or any property of any or each of the undersigned while in, on or upon said premises.

"This release shall be binding upon the distributees, heirs, next of kin, executors and administrators of each of the undersigned.

"In signing the foregoing release, each of the undersigned hereby acknowledges and represents: (a) That he has read the foregoing release, understands it, and signs it voluntarily; (b) That he is over 21 years of age and of sound mind; (c) That he is not an agent, servant, or employee of S. R. E. and/or any of the agents, officers, servants, or employees of the promoter; (d) That he is an independent contractor and assumes and takes all responsibility for all charges, premiums and taxes, if any, payable on any funds he may receive as a result of his activities, including, without limiting the generality of the foregoing, social

security taxes, unemployment insurance taxes, compensation insurance, income taxes and withholding taxes."

Standing alone, the provision, "each of the undersigned hereby releases S. R. E. the licensed promoter, and its agents, officers, servants, and employees," might be construed as meaning that Southern Racing Enterprises, Inc., was the licensed promoter and that, therefore, the contract "released" only Southern Racing Enterprises, Inc. However, the contract must be construed as a whole. The contract was captioned by the names of Southern Racing Enterprises, Inc., and Gainesville Speedway, Inc. It also provided: "(c) That he [undersigned] is not an agent, servant, or employee of S. R. E. and/or any of the agents, officers, servants, or employees of the promoter." If Southern Racing Enterprises, Inc., was the promoter, the last phrase of the above quoted provision would be redundant. The plaintiff understood that Gainesville Speedway, Inc., and not Southern Racing Enterprises, Inc., was the promoter because he alleged that Gainesville Speedway, Inc., was the promoter and that Southern Racing Enterprises, Inc., supervised, controlled, conducted and officiated at the races. Under these circumstances, the only reasonable interpretation that can be placed on the phrase, "each of the undersigned hereby releases S. R. E. the licensed promoter, etc." is that the plaintiff "released" Southern Racing Enterprises, Inc., and the licensed promoter who was the Gainesville Speedway, Inc.

■ The evidence demanded a finding that the defendant Hunter was not in the scope of his employment at the time of the collision. He was employed by Nalley as a mechanic and as a wrecker driver. He was allowed to keep the wrecker when he was not working at Nalley's shop for the purpose of hauling in any wrecks and for this he would receive part of the hauling charge. His sole purpose in being at the race was for his own pleasure and for the purpose of hauling any wrecks that might occur during the races. He was not authorized to assist in any way the operation of the race track and he had no authority to assist in the repair of a public address system.

■ The court erred in directing a verdict for the defendant Hunter. He testified in part: "No one at the Gainesville Speed-

way that afternoon other than a Nalley official had a right to tell me how to operate that wrecker from a mechanical viewpoint. They couldn't have taken me off that wrecker and put me to doing some other work. I had exclusive control of that wrecker that Sunday afternoon of the collision. . . I have been out to the race track several times and have watched quite a few of the races. I watch the races when I go out there and I know the race track is a dangerous place if you get on it. . . I was on the left side of the track, parked, with relation to the starting line. I was completely off the track. . . I crossed and went up on the right hand side. I crossed over these tracks that the racers had made from the left-hand side and went to the right-hand side. I didn't stop at any time between the time I crossed over and the time I cut onto the tracks. Before I went on the tracks I stopped and looked both ways. I got about ten feet on to the track. I didn't move on to the track until I saw everything was clear. I was up next to the finishing line when the collision occurred. I was right on the right-hand side of the track when I started to make the left-hand turn. I never paid no attention to whether that was the track the cars had been using or not. I looked back to the left when I started to make the turn. I had gone half the length of the wrecker when he hit me after I started the turn. That would be about 8 or 10 feet. I mean to tell the jury that I looked back down the track before I started making the turn but I didn't see the car until it hit me. I didn't see the car until after I had started the turn. I looked in the mirror before I turned and I seen him and hit my brakes. That car was running faster than I was and it wouldn't take him but a second to get two-thirds of the way down the track after he left and before he hit me. No one told me when to make the left turn. I made up my own mind when to turn to the left. The fellow with me hollered 'Look out'—something about a car coming. I have been out to the race track several times and am thoroughly familiar with it. ... I was parked on the left-hand side of the race track. That race track was approximately a hundred feet wide. I said that on this occasion an official asked me to go down there. I couldn't tell you if it was an official of the Southeastern Racing Association; it was one of the men there

that was conducting the race. He asked me to go down and let him get on my boon so he could check the wires. The person did not instruct me which way to go. He did not instruct me to go across from the left-hand side to the right-hand side. He didn't say whether to go on the track or across it. He did not instruct me after I had gone down the right-hand side to turn to the left; that was a matter entirely up to me."

The evidence demanded a finding that in the operation of the wrecker at the time of the collision, Hunter was not acting under the direction of someone else but was completely in charge and was driving according to his own judgment. The evidence did not authorize a finding that Cecil Hunter was an employee, agent or servant of Southern Racing Enterprises, Inc., Gainesville Speedway, Inc., or any of their officials, employees, agents or servants. Therefore, the release of Southern Racing Enterprises, Inc., and Gainesville Speedway, Inc., did not inure to the benefit of Cecil Hunter. Nor does the evidence show that Cecil Hunter knew or had the right to expect that a race would not be started or would not be in progress when he drove his wrecker onto the track. As to whether Cecil Hunter was negligent in so operating the wrecker and whether the plaintiff was also negligent are questions which should have been resolved by a jury.

The court did not err in directing a verdict for the defendants Southern Racing Enterprises, Inc., Gainesville Speedway, Inc., and C. V. Nalley, Inc. The court erred in directing a verdict for the defendant Cecil Hunter.

The court did not err in denying the motion for new trial as to the defendants Southern Racing Enterprises, Inc., Gainesville Speedway, Inc., and C. V. Nalley, Inc. The court erred in denying the motion for new trial as to the defendant Cecil Hunter.

*Judgment affirmed in part and reversed in part. Nichols, J., concurs. Quillian, J., concurs specially.*

Quillian, J., concurring specially. I agree with the majority opinion that the instrument termed a release was a covenant not to sue.

The instrument was ambiguous as to whether Gainesville Speedway, Inc., was the promoter relieved of liability. The plaintiff's own pleading and proof clearly and conclusively es-

tablished that the Speedway Corporation was the promoter intended by the parties to be protected under the terms of the contract.

The petition alleged: "At all times herein mentioned said corporate defendant Gainesville Speedway, Inc., was in the business of promoting races between stock and modified automobiles of individual owners, and maintained and operated a race tract off the Cleveland Highway, in Hall County, Georgia, and charged admission to spectators to see said races."

The plaintiff testified: "I believe it is correct that the Gainesville Speedway leased the track out there and they handled the advertising for the race. The Southeastern Enterprises actually conducted the races and controlled them."

The question as to the liability of C. V. Nalley, Inc., is a close one. In *Dawson Motor Co. v. Petty*, 53 *Ga. App.* 746, 749 (186 S. E. 877) it was held: "When the plaintiff showed by competent uncontradicted evidence that the defendant was the owner of the automobile that injured him and that the person operating it was, at the time of the injury, in the defendant's employment, the presumption arose that the servant was engaged in the master's business and within the scope of his employment; and the burden was then on the defendant to show that the person operating the machine was not his servant, or was not at the time of the injury engaged in the business of the master." There are many similar holdings.

In the instant case the evidence showed that Hunter was the employee of C. V. Nalley, Inc., operating and in charge of its wrecker, with the broad authority to do whatever was customary in rendering services for which the vehicle was designed. But I do not think that where a servant is in charge of a vehicle or other equipment of his employer which is adapted to a particular function, the presumption arises that he is the master's agent authorized to render services of a nature entirely different from that in which such vehicle or equipment is commonly employed. The wrecker service was disassociated with the work of an electrician such as Hunter undertook to engage in on the occasion under investigation. By way of illustration, if an employee drives his master's milk or laundry truck to the race track it

raises no presumption that he is authorized to drive the same in the races, or as for that matter, to transport passengers to and from the race track. If he drives his master's automobile adapted to racing or transportation of passengers, the pronouncement of the *Dawson Motor Co.* case, supra, applies, and the presumption does arise that he is acting for his master and within the scope of his employment.

I have carefully considered the question as to whether Hunter's conduct in driving the truck upon the race track to repair the electric wires necessary to the successful operation of the Speedway Corporation's speaker constituted a mere deviation from the course of his employment, as was, in the case of *Limerick* v. *Roberts*, 32 *Ga. App.* 755 (124 S. E. 806) held not to constitute a departure from the course of his employment, or whether using the wrecker in the manner and for the purpose it was employed was an entire departure from and an act not within the scope of his employment. I am constrained to hold that the use of the truck in carrying on a business that the master was not engaged in, and for a purpose that the master could not have reasonably contemplated the vehicle would be put to, was not a mere deviation but an abandonment of Hunter's employment. Hence, his employer was not responsible under the doctrine of respondeat superior for his negligent act.