Darci Ann JOHNSON (Mohr),
Plaintiff and Appellant,

v.

RAPID CITY SOFTBALL ASSOCI-
ATION, and City of Rapid City,
Defendants and Appellees.

No. 18269.

Supreme Court of South Dakota.

Argued Dec. 1, 1993.

Decided March 30, 1994.

Marya Vrooman Rogers, Finch Bettmann Maks, P.C., Rapid City, for plaintiff and appellant.

Michael J. Larson, Lynn, Jackson, Shultz & Lebrun, Rapid City, for defendants and appellees.

SABERS, Justice.

Injured softball player filed a complaint against Rapid City Softball Association and Rapid City alleging negligence. Circuit Court granted Defendants' motion for summary judgment because the South Dakota Recreational Use Statutes precluded liability and player signed a release. Player appeals. We reverse and remand.

## FACTS

On April 21, 1989, Darci Johnson (Johnson) signed up to play softball with the Arrow Bonding Outlaws. As required by the Rapid City Softball Association (Association), she signed a roster and paid her $15.00 player fee. A copy of the roster is attached to this opinion.

Johnson, the team manager and a practicing attorney, acknowledges that she signed a roster but not a release. Defendants claim that Johnson admitted that she saw the release prior to signing the roster. According to Johnson's deposition, however, she does not recall whether the release language was printed at the bottom of the roster when she signed it. Johnson testified that if it was, she did not read it.

Johnson injured her right ankle sliding into third base during a softball game on July 24, 1989. The injury occurred at Robbinsdale Park softball complex on one of several fields owned by the City of Rapid City (City). City leases the fields to Association for the purpose of operating a city softball league. Under the lease agreement, Association maintains the fields under the supervision of the City Parks Superintendent.

Johnson filed a Complaint against Association and City alleging negligence in the placement or maintenance of the third base bag. Defendants filed a Motion for Summary Judgment which was granted. Johnson appeals.

1. **Whether the Recreational Use Statutes apply to a city-owned softball complex leased to an organized association for valuable consideration**

**when there is a $15 player fee.[1]**

■ The circuit court granted Defendants' Motion for Summary Judgment in part because "the South Dakota Recreational Use Statutes preclude liability on the part of the Defendants since the activity is one contemplated by the statutes, and no charge was made for entry onto the softball grounds." [2] "We review summary judgment determinations *de novo*, independent of the trial court's decision." *Silingo v. Village of Mukwonago*, 156 Wis.2d 536, 458 N.W.2d 379, 380 (Ct.App. 1990) (citation omitted). The construction of a statute and its application to a set of facts present questions of law, matters reviewed by us without deference to the trial court's decision. *Id.* (citation omitted).[3]

The three purposes of recreational use statutes are:

1. To encourage landowners to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes;

2. To refuse to impose upon farmers or other owners of vast tracts of land a duty of reasonable care to visitors who enter for recreational purposes because it would be burdensome and unfair, and

3. To encourage landowners to allow sportsmen to hunt on forest land for the purpose of thinning out excessively large herds of animals which were inhibiting forest production.

Joseph A. Page, The Law of Premises Liability § 5.14, at 117 (2nd ed. 1988). *See also*

Welter, *Premises Liability*, 33 S.D.L.Rev. at 76 n. 85.

SDCL 20-9-13 provides:

Except as provided in § 20-9-16, an owner of land owes no duty of care to keep the land safe for entry or use by others for outdoor recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on his land to persons entering for outdoor recreational purposes.

And SDCL 20-9-12 provides in part:

(3) "Outdoor recreational purpose," includes, but is not limited to, any of the following activities, or any combination thereof: hunting, fishing, swimming other than in a swimming pool, boating, canoeing, camping, picnicking, hiking, biking, off road driving, nature study, water skiing, winter sports, snowmobiling, viewing or enjoying historical, archaeological, scenic or scientific sites[.]

SDCL 20-9-12(3) provides an extensive list of the activities included within the term "outdoor recreational purpose." While softball is not listed as an "outdoor recreational purpose," the activities are "not limited to" those listed.

■ Defendants cite *Miller v. City of Dayton*, 42 Ohio St.3d 113, 537 N.E.2d 1294 (1989), in support of their position that softball is an activity included within the definition of "outdoor recreational purpose." In *Miller*, however, the Ohio Supreme Court determined that the presence of man-made improvements on the property did not remove the property from statutory protection

1. If the Recreational Use Statutes apply, the release was not needed and it would not be necessary to reach Issue 2. Likewise, it would not have been necessary for the City to require the Association to purchase and maintain liability insurance.

2. Through the Recreational Use Statutes, South Dakota has

legislatively granted additional land occupier immunity in situations where an entrant comes upon an occupier's land for recreational purposes without conferring any economic benefit, or consideration upon the occupier. Such entrants are substantively treated as "trespassers," and liability attaches only to the land occupier's gross negligence or wilful or wan-

ton misconduct. Nothing in the statutes limits any liability which would otherwise exist for injuries suffered where the occupier charges the entrant a fee. The category of "licensee" is essentially eliminated in these circumstances. Mark J. Welter, *Premises Liability: A Proposal to Abrogate the Status Distinctions of "Trespasser," "Licensee" and "Invitee" as Determinative of a Land Occupier's Duty of Care Owed to an Entrant*, 33 S.D.L.Rev. 66, 79 (1988).

3. The issue of whether the Recreational Use Statutes provided the defendant with immunity was not considered in *Deuchar v. Foland Ranch, Inc.*, 410 N.W.2d 177 (S.D.1987), because the circuit court never reached the issue and therefore it was not before this court on appeal. *Id.* at 182.

because the Ohio recreational use statute defined premises as "all * * * lands, ways, waters, *and any buildings and structures thereon* * * *." 537 N.E.2d at 1296 (emphasis in original) (citing R.C. 1533.–18(A)).

In comparison, the South Dakota statutes exempt from liability owners of land and define land as "land, trails, water, watercourses, private ways and agricultural structures, and machinery or equipment if attached to the realty." SDCL 20–9–12(1). The statute appears to exclude softball fields. *See Miller,* 537 N.E.2d at 1296 (the essential character of the property should fit within the intent of the statute). Additionally, the South Dakota statute demonstrates a pattern which does not include softball. While the legislature included "winter sports" within the list of activities, "summer sports," and specifically softball, were not listed. The inclusion by the legislature of the term "winter sports" seems to imply consideration and rejection of "summer sports." This indicates that the South Dakota statute does not apply to owners of softball fields.

■ The Recreational Use Statutes "are in derogation of the common law" and "must be strictly construed." Page, *The Law of Premises Liability* § 5.14, at 117. Therefore, we refuse to expand the list absent clear legislative intent that the list was intended to include summer sports and softball. *See Robbins v. Great Northern Paper Co.,* 557 A.2d 614, 617 (Me.1989) (Glassman, J., dissenting). ("Since the recreational land use statute limits the common law tort liability landowners have toward licensees, ... the statute should 'be construed to alter the common law only to the extent that the Legislature has made that purpose clear' "). Because softball is not an activity contemplated by the statute, the statute does not provide City and Association immunity from liability for alleged negligence as landowner and lessee of the softball field.

■ Although this holding is determinative of this issue, the circuit court's conclusion that the Defendants were entitled to summary judgement because "no charge was made for entry onto the softball grounds" will also be discussed.

SDCL 20–9–16 provides in part:

Nothing in §§ 20–9–12 to 20–9–18, inclusive, limits in any way any liability which otherwise exists:

(2) For injury suffered in any case where the owner of land charges any person who enters or goes on the land for the outdoor recreational use thereof[.]

And SDCL 20–9–12 provides in part:

(4) "Charge," the admission price or fee asked in return for invitation or permission to enter or go upon the land.

Because the recreational use statutes limit common law tort liability, the "charge" ("admission price or fee") exception "must be given the broadest reading that is within the fair intendment of the language used." *Robbins,* 557 A.2d at 617–18 (Glassman, J., dissenting) (quoting *Copeland v. Larson,* 46 Wis.2d 337, 174 N.W.2d 745, 749 (1970)).

■ Johnson paid a $15.00 "player fee." According to the roster, the deadline for payment of fees at the Robbinsdale Softball Office was April 22, 1989. The use of the term "deadline" and the deposition of Ronald Jeffries, the team's coach, indicate that if Johnson had not paid her "player fee," she would not have been able to play in the Association. Whether Johnson was "charged" a fee and would have had permission to play on the field or team is a question of fact, inappropriate for summary judgment.

■ Additionally, Association leased the fields from City for $1.00 and "other good and valuable consideration." The "other" consideration included administration of a softball league open to the public, maintenance of the general grounds, and responsibility for mowing the field and all electrical bills. In addition, City required Association to purchase liability insurance. In construing the exception broadly, we. find that the fee of $1.00 combined with "other good and valuable consideration" may constitute a charge within the purview of the statutes. While under the terms of the lease, other persons or organizations were allowed to use the softball fields, the Association had "priority use of the facilities during the lease peri-

od." *Compare Flohr v. Pennsylvania Power & Light Co.*, 800 F.Supp. 1252 (E.D.Pa.1992) (citing *Garreans v. City of Omaha*, 216 Neb. 487, 345 N.W.2d 309 (1984) (campers found to be nonpaying, recreational users when payment of a fee by campers did not entitle them to a greater right to use the park facilities than that held by the general public)). Clearly, the City granted the Association "priority use" of the fields in exchange for "other good and valuable consideration" in lieu of a higher fee. As noted in footnote 2, South Dakota has granted land occupier immunity "where an entrant comes upon an occupier's land for recreational purposes *without conferring any economic benefit, or consideration* upon the occupier." Welter, *Premises Liability*, 33 S.D.L.Rev. at 79 (emphasis added). Clearly, the lease of the fields conferred an economic benefit or consideration upon City.

> Contrary to the court's holding, the legislative goal of the statute is clearly articulated in the statute as it relates to the facts of this case: If [the City] will open its land to recreational use by the public without any payment of consideration to it, it will not be liable in damages for injuries occurring to any member of the public while on the land; however, if [the City] requires that any consideration be paid to it for such recreational use by any member of the public, as to that paying member, [the City] will be liable under the common law principles governing landowner and licensee.

*Robbins*, 557 A.2d at 619. Therefore, the circuit court's conclusion of "no charge" was in error.

### 2. Whether the roster signed by Johnson was sufficient to release Association and City from liability.

■ The circuit court granted Defendants' Motion for Summary Judgment in part because Johnson "executed a release of the Defendants from liability for injuries which she sustained as a result of participation in the softball activity." A release is contractual in nature and governed by the law of contracts. *Erck v. Bachand*, 69 S.D. 330, 335, 10 N.W.2d 518, 520 (1943) (citations omitted). The essential elements to a con-

tract are: (1) Parties capable of contracting; (2) Their consent; (3) A lawful object; and (4) Sufficient cause or consideration. SDCL 53–1–2. Johnson argues on appeal that summary judgment was improperly granted because there was a material issue of fact regarding her consent. According to Johnson, at the time she signed the paper containing the "release", she thought she was signing a "roster," and therefore, there was no consent to release.

Our standard of review of summary judgment is settled.

> In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*Lamp v. First Nat'l Bank*, 496 N.W.2d 581, 583 (1993) (citing *Waddell v. Dewey County Bank*, 471 N.W.2d 591, 593 (S.D.1991) (citations omitted)).

■ "To be valid, a release must be fairly and knowingly made." *Paterek v. 6600 Ltd.*, 186 Mich.App. 445, 465 N.W.2d 342, 344 (1990) (citations omitted). A release is not fairly made and is invalid if the nature of the instrument was misrepresented or there was other fraudulent or overreaching conduct. *Id.* (Citation omitted). *See also Dombrowski v. City of Omer*, 199 Mich.App. 705, 502 N.W.2d 707, 709 (1993).

In *Paterek*, the injured player claimed on appeal "that there was an issue of material fact regarding whether the nature of the document which he signed was misrepresented as a roster, as opposed to a release." 465

N.W.2d at 344. While the Michigan Court of Appeals held that there was no genuine issue of material fact and the plaintiff's claim was barred by the release, beneath the relevant release language in *Paterek* was the statement "I have read the above terms of this contract, understand them and agree to abide by them. I, the undersigned player, acknowledge that I have read and understand the above contract." *Id.*

The Court in *Paterek* distinguished *Kropff v. City of Monroe*, 128 Mich.App. 450, 340 N.W.2d 119 (1983), which held that the trial court erred in granting the motion for accelerated judgment and resolving the factual dispute as to whether a release signed by the injured player was presented as a roster, not as a release. In distinguishing *Kropff,* the *Paterek* Court noted that the release in *Kropff* "did not contain a plain and clear statement, *directly before the signature lines,* stating that the player acknowledged reading and understanding the contract." 465 N.W.2d at 345 (emphasis added).

In this case, as in *Kropff,* the release did not contain a plain and clear statement *directly before the signature lines.* Rather, the release was at the bottom of the roster, beneath all of the signatures of the team members. *Compare Dombrowski,* 502 N.W.2d at 711 ("There might be some validity to plaintiff's argument had the document been entitled 'Rope Climb Sign-up Sheet' and contained a vague reference advising participants to read the reverse side before signing, with a clause waiving liability being printed on that reverse side in two-point type and written in such legalese that it would take a lawyer several hours to decipher.")

According to Johnson's deposition, while she acknowledges signing a roster, she did not sign what she perceived to be a waiver or release. And Ronald Jeffries, the team's coach, testified that he did not explain the release to any of the players. Rather, he told the players that this was the roster which they needed to sign before they could play. *Compare Id.* at 710. ("[H]ad Tremble handed the document to plaintiff stating that it was merely a sign-up form and of no consequence, then, perhaps, rescission would be appropriate on the basis that plaintiff's signature on the release form had been induced by fraudulent misrepresentation.")

■ Whether Johnson was aware she was signing a release and releasing "the Defendants from liability for injuries which she sustained as a result of participation in the softball activity" is a factual question. In granting the Defendants' motion, the circuit court resolved this factual question. This was error. If a court, in ruling on a motion for summary judgment, engages in fact-finding, reversal is required. *Kropff,* 340 N.W.2d at 120. "Summary judgment should not be granted unless the moving party demonstrates a right to a judgment with such clarity as to leave no room for controversy." *Silingo,* 458 N.W.2d at 383 (citation omitted). Controversy exists as to whether Johnson consented to the release. Therefore, a genuine issue of material fact exists. We reverse and remand for trial.

AMUNDSON, J., concurs.

WUEST, J., concurs in result and concurs specially.

MILLER, C.J., and, HENDERSON, J., dissent.

APPENDIX

All Fees are to be paid at the Robbinsdale Softball Office. The deadline is 1:00 P.M. APRIL 22, 1989. You must pay for all ballplayers on the Roster with a minimum of ten.

MANAGER'S NAME _____ Home 343-737¥
PHONE: Work 344-744
ADDRESS 3411 W. Foothills Dr.
COACH Ron Jeffries
PHONE: Work 343-440  Home same
ADDRESS 303 Meadowbrook Ct. S.D. 57702

| ROSTER NAME | PHONE | SIGNATURE | PAID | OFFICE USE DATE | OFFICE USE PAID |
|---|---|---|---|---|---|
| Judy Koerner | 343-2402 (w) | Judy Koerner | ✓ | 4/21/89 | ✓ |
| Kim Koerner | 342-0020 (w) | Kim Koerner | X | | ✓ |
| Patti Haas | 394-246 (w) 343-737¥ (h) | | | | ✓ |
| Barb Ertz | 394-6755 | | X | | ✓ |
| Cathy Purdul | 787-534(w) 343-7440(h) | Cathy Purdul | X | | ✓ |
| Veronica Bowen | 342-583/344-241 | Veronica Bowen | X | | ✓ |
| Lisa Joskall | 341-4646/341-601 | Lisa Joskall | X | | ✓ |
| Kim Morrison | 3-491-139/4-595 | Kimberly Morrison | X | | ✓ |
| Dawn Thorpe | 343-0584/394 | Dawn M Thorpe | X | | ✓ |
| Betty Caliendo | 343-4085 Box | Betty Caliendo | X | | ✓ |
| Marci Russell | 393-1695 | Marci Russell | X | | ✓ |
| Annie McKee | 348-3801/394 | Annie McKee | X | | ✓ |
| Reanne Yuskus | 343-4502/2397 | Reanne Yuskus | X | 4/21/89 | ✓ |
| Colleen Marthaler | 394-2441/394-5001(h) | Colleen Marthaler | X | 5/5/89 | ✓ |
| Desera Niemi | 393-1040/343-533 | Desera Niemi | Y | 6/19/89 | ✓ |
| Kim Schaefer | 343-8180 | Kim Schaefer | | | ✓ |

WE DO HEREBY RELEASE THE R.C. SOFTBALL ASSN., THE R.C. PARKS/REC. DEPARTMENT AND THE CITY OF RAPID CITY FROM ANY AND ALL LOSS OR INJURY WHILE WE ARE PARTICIPATING IN THE R.C. SOFTBALL ASSN. SANCTIONED PROGRAM.

WARNING

SOFTBALL MAY BE HAZARDOUS TO YOUR HEALTH!!!

( ) MEN'S A
( ) MEN'S B-1
( ) MEN'S B-2
( ) MEN'S C-1
( ) MEN'S C-2
( ) MEN'S C-3
( ) MEN'S C-4
( ) WOMEN'S A
( ) WOMEN'S B
( ) WOMEN'S C
(X) WOMEN'S D

FOR OFFICE USE ONLY

Cash _____ Amount $75.00
Check Number _____
Paid By Ron Jeffries
Rec'd By B. L. Warren
Date 4/21/89

EXHIBIT NO. 1
10-16-91
D. CLAYBORNE

WUEST, Justice (concurring in result and concurring specially).

While I concur in the result in this case, I write specially to address certain points that merit the attention of this court.

1. *Construction of Anticipatory or Pre-injury Releases*

A review of the cases that involve releases in conjunction with a recreational activity reveals two evident trends:

First, the more inherently dangerous or risky the recreational activity, the more likely that an anticipatory release will be held valid. That is, individuals who engage in activities like mountain climbing, race car driving, parachute jumping, and the like, are more likely to be held to have an understanding of the risky nature of their chosen activity. *Lee v. Beauchene*, 337 N.W.2d 827 (S.D. 1983); *Jones v. Dressel*, 623 P.2d 370 (Colo. 1981); *Gross v. Sweet*, 49 N.Y.2d 102, 424 N.Y.S.2d 365, 400 N.E.2d 306 (1979).

Second, anticipatory, pre-injury releases are much more likely to be deemed valid and enforceable when they are written on a *separate document* —that is, not imbedded in an application, rental agreement, or sign-up sheet. A good example is found in *Baker v. City of Seattle*, 79 Wash.2d 198, 484 P.2d 405 (1971). When Baker rented a golf cart at a city golf course, the rental agreement contained a clause stating in part that the "Lessor shall not be liable for any damages whatsoever arising from injuries to the person and/or property damage or loss ... from *whatever cause arising.*" 484 P.2d at 406. The brakes on the cart failed, the cart overturned, and Baker was injured. Especially because the disclaimer was in the middle of the agreement and was not conspicuous, the court held the disclaimer was invalid. *Id.* at 406–07. *See also Rosen v. LTV Recreational Development, Inc.*, 569 F.2d 1117 (10th Cir. 1978). Rosen was injured in a ski area; his season pass contained pre-injury release language, wherein the purchaser of the pass accepted the "existence of such dangers ... including the chance of injury." 569 F.2d at 1122. The court stated that, "Because of its

one-sidedness, [such pre-injury releases must] be interpreted strictly in considering the rights of the party who has prepared it." *Id.* The court held that the agreement fell short of saying that the "ski area may be negligent toward the signer free of liability." *Id.* at 1123.

General discussion of pre-injury releases and exculpatory clauses is found in 1 STUART M. SPEISER ET AL., THE AMERICAN LAW OF TORTS § 5.39 at 1084–98 (1983). This treatise states in part:

> As to *construction* of anticipatory or pre-injury release clauses, it is a favored rule that the law's reluctance to enforce exculpatory provisions of this nature has resulted in the development of an exacting standard by which courts measure their validity. So, it has been repeatedly emphasized that unless the intention of the parties is expressed in unmistakable language, an exculpatory clause will not be deemed to insulate a party from liability for his own negligent acts. Not only does this stringent standard require that the drafter of such an agreement make its terms unambiguous, but it mandates that the terms be understandable as well.... Of course, this does not imply that only simple or monosyllabic language can be used in such clauses. Rather, what the law demands is that such provisions be clear and coherent. In applying this rule of strict construction, particularly where the court is able to ascertain any ambiguity, the one-sidedness or adhesion nature of such contracts is often emphasized.

*Id.* at 1087–88 (footnotes and citations omitted).

In the present case, if Johnson did not sign the roster and pay her fifteen dollars, she could not play softball in Rapid City. Thus, this was a "one-sided" agreement, and the rules of construction expressed above should apply. These rules of construction are applied in *Dobratz v. Thomson*, 161 Wis.2d 502, 468 N.W.2d 654 (1991), wherein the Wisconsin Supreme Court carefully considered the validity of an anticipatory release,* reviewing

---

* The language of the *Dobratz* release stated in pertinent part:

the facts and circumstances of the agreement "to determine whether [the release] expresses the intent of the parties with particularity." 468 N.W.2d at 660. In *Dobratz*, a case involving water skiing club activities, the court held that the language of the release was not particular enough to exculpate the defendants from liability. *Id.* at 662. In particular, the court found that the language failed to specify the particular skiing stunts that Dobratz might be asked to perform, nor did it specify the level of difficulty or dangerousness of these stunts; and the record made clear that no such information was provided to the participant. *Id.* at 661–62.

In the present case, Johnson contends that the softball field (in particular, the base) was negligently maintained. This is, of course, a question of fact. However, it is a question of fact that cannot be reached until the validity of the document signed by Johnson is determined. A player signing the Rapid City Softball Association roster would not have had any reason to read the language at the bottom of the sheet of paper; this is why a separate form is recommended for such anticipatory releases—then there is little question that the signer had a fair opportunity to see and read the language. Further, a review of the language on the team sign-up sheet does not convince the reader that such language could be clearly understood to mean the following: *The Rapid City Softball Association, and the City of Rapid City, may negligently maintain the softball fields; and if a player is injured due to that negligence, there is no recourse.* To find a valid release in this case, we must find that Johnson agreed that the fields could be negligently maintained. Review of both the form and the substance of the language at the bottom of the team sign-up sheet fail to convince that Johnson signed a valid anticipatory release.

## 2. Public Policy Considerations—Exculpatory Releases

It has been stated that, " 'anticipatory releases are neither unusual nor per se void as a matter of public policy.' " SPEISER, AMERICAN LAW OF TORTS § 5.39 at 1085 n. 98 (quoting *American Druggists' Ins. Co. v. Equifax, Inc.*, 505 F.Supp. 66, 68 (S.D.Ohio 1980) and citing *Colton v. New York Hosp.*, 98 Misc.2d 957, 414 N.Y.S.2d 866, 874 (N.Y.Sup.1979)). The line of cases cited therein all concern "purely voluntary activity by the promisor and involved no relationship or activity affected by a public interest. All were activities which could be considered societally insignificant." *Id.*

The present case, however, may involve a matter of public interest worthy of attention by this court. The nature of this public interest is found in a line of cases represented by *Wagenblast v. Odessa Sch. Dist. No. 105-157-166J*, 110 Wash.2d 845, 758 P.2d 968 (1988). *Wagenblast* involved releases signed by public school students and their parents as a condition of participation in extra-curricular sports and other activities. 758 P.2d at 969. The court framed the issue as follows:

> Can school districts require public school students and their parents to sign written releases which release the districts from the consequences of *all future school district negligence*, before the students will be allowed to engage in certain recognized school related activities, here interscholastic athletics?

*Id.* at 969–70. Obviously, the question in the case before us does not involve a school district. However, we are faced with an issue involving city baseball, softball, and other athletic fields. There is a great deal of emphasis on sports and athletics in our society. If an individual wishes to play in an

---

I, hereby release, and agree to hold harmless the Webfooter Water Shows Inc., the promoters, the owners and lessees of the premises, the participants, and the officers, directors, officials, representatives, agents and employees of all of them, of any and from all liability, loss, claims, and demands that may accrue from any loss, damage or injury (including death) to my person or property, in any way resulting from, or arising in connection with this event, and whether arising while engaged in competi-

tion or in practice or preparation therefore, or while upon, entering or department from said premises, from any cause whatsoever. I know the risk and danger to myself and property while upon said premises or while participating or assisting in this event, so voluntarily and in reliance, upon my own judgment and ability, and I hereby assume all risk for loss, damage or injury (including death) to myself and my property from any cause whatsoever.
468 N.W.2d at 657 n. 1.

organized softball league—in Rapid City, as well as many other towns and cities in South Dakota—they must play on fields owned and maintained by the city. There is no choice to play elsewhere. Do we wish it to be the law in South Dakota that those athletic fields may be negligently maintained with impunity? Are all participants—adults and children—who participate in organized athletics to be faced with a take-it-or-leave-it choice when presented with such anticipatory releases, as a condition of participation? If we uphold these types of releases, that is what we are saying the law is in South Dakota.

Guidance is found in *Wagenblast*, wherein the court carefully reviewed "exculpatory agreement" cases, and formulated six characteristics, "the more [of which] appear in a given exculpatory agreement case, the more likely the agreement is to be declared invalid on public policy grounds." 758 P.2d at 971. Thus, all six factors need not apply to a given situation; instead, these factors would be applied in weighing the equities of the situation. ᵢ These six characteristics are listed here:

1. *The agreement concerns an endeavor of a type generally thought suitable for public regulation.*

2. *The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.*

3. *Such party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.*

4. *Because of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks the services.*

5. *In exercising a superior bargaining power, the part confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay*

*additional reasonable fees and obtain protection against negligence.*

6. *The person or property of members of the public seeking such services must be placed under the control of the furnisher of the services, subject to the risk of carelessness on the part of the furnisher, its employees or agents.*

*Id.* at 972–73. These six characteristics appear to be well-considered and have applicability to the present case. It is generally thought proper that municipalities offer opportunities to participate in organized athletics, such as softball and baseball leagues. Municipalities generally own and maintain the athletic fields. While athletics are not "necessary" to survival, there is certainly a great deal of emphasis in our society on community recreational sports. Those members of our communities wishing to participate in organized sports usually do not have a choice to go elsewhere to play; they must play on the public athletic fields. It is possible that for an additional fee, additional protection against negligence could be purchased.

Similarly, the court in *Dobratz* acknowledged the *Wagenblast* factors—and pointed out that they were not particularly helpful to the plaintiff. 468 N.W.2d at 660 n. 5. The court noted that water-skiing is "not a subject 'generally thought suitable for public regulation,' or 'a service of great importance to the public'[.]" Nor did the defendant in this case "have a 'decisive advantage in bargaining strength.'" *Id.* The *Dobratz* court also applied the Restatement (Second) of Contracts § 195 which lists certain situations where exculpatory contracts are unenforceable on grounds of public policy.ˑ The pertinent language states:

(2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if ... (b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty....

·468 N.W.2d at 659 (citing Restatement (Second) of Contracts § 195 (1979)). Under the circumstances of that case, the court did not find that the *Dobratz* water-skiing club re-

lease was unenforceable on grounds of public policy.

Whether cities should be able to free themselves for all liability for negligence in the maintenance of public athletic fields is questionable public policy. Application of either the six factors listed in *Wagenblast,* or the Restatement (Second) of Contracts § 195, would militate against validating anticipatory exculpatory agreements in situations like that presented here. The case at bar presents us with this question, and it is an issue that should be faced by this court.

HENDERSON, Justice (dissenting).

I respectfully dissent.

In my opinion, the roster and release form, signed by Johnson, was sufficient to release Rapid City and the Rapid City Softball Association from liability. Although Johnson does not dispute signing this form, she now contends that she did not know what she signed.

Besides being a softball player and the team's manager when she signed the form, she was also a practicing attorney. Lawyers must be learned in the law. Educational requirements consist of satisfactorily passing an examination conducted by the State Board of Bar Examiners and graduation from a law school accredited by the American Bar Association. SDCL 16–16–6. In my opinion, she knew what she signed but does not want to be bound by what she signed.

South Dakota precedent recognizes that parties can agree to assume risks which are part and parcel of a sporting event. In *Lee v. Beauchene,* 337 N.W.2d 827, 829 (S.D. 1983), this Court upheld the validity of a release where the plaintiff was injured due to an alleged negligently maintained race track. "The conduct complained of and the type of accident that occurred are clearly contemplated by, and within the scope of the release." *Id.* According to her coach's deposition, Johnson was not a good slider and ordinarily ran into base standing up. She purposely avoided sliding. Softball, while not a dangerous sport, is certainly not immune to injuries. Sliding is an expected part of the competition and clearly contemplated by the parties; it is innate to the game. Thus, injuries occurring therefrom are encompassed by the release. *Harris v. Walker,* 119 Ill.2d 542, 116 Ill.Dec. 702, 519 N.E.2d 917 (1988); *Trainor v. Aztalan Cycle Club, Inc.,* 147 Wis.2d 107, 432 N.W.2d 626 (App. 1988); *Malecha v. St. Croix Valley Skydiving Club,* 392 N.W.2d 727 (Minn.App.1986). "The parties need not have contemplated the precise occurrence which occurred as long as it is reasonable to conclude the parties contemplated a similarly *broad* range of accidents." *Korsmo v. Waverly Ski Club,* 435 N.W.2d 746, 749 (Iowa App.1988) (emphasis added) (citing *Schlessman v. Henson,* 83 Ill.2d 82, 46 Ill.Dec. 139, 141, 413 N.E.2d 1252, 1254 (1980)). This is consistent with a large and growing number of cases in other jurisdictions upholding these agreements in "sporting event" situations as noted by *Aztalan Cycle Club,* 432 N.W.2d at 631.* Naturally, there is recourse for intentional, willful or wanton acts.

Johnson bears the responsibility of avoiding the release. For her to now say that she did not know what she was signing is, in effect, to plead and assert that she is ignorant about her rights. Her argument is blatantly ridiculous. It is so weak that she does not even allege trickery, artifice, fraud, or

---

* *See,* e.g., *Gore v. Tri–County Raceway, Inc.,* 407 F.Supp. 489 (M.D.Ala.1974); *Valley Nat. Bk. v. Stock Car Auto Racing,* 153 Ariz. 374, 736 P.2d 1186 (App.1987); *Coates v. Newhall Land & Farming, Inc.,* 191 Cal.App.3d 1, 236 Cal.Rptr. 181 (1987); *Hulsey v. Elsinore Parachute Center,* 168 Cal.App.3d 333, 214 Cal.Rptr. 194 (1985); *Doster v. C.V. Nalley, Inc.,* 95 Ga.App. 862, 99 S.E.2d 432 (1957); *Lee v. Sun Valley Co.,* 107 Idaho 976, 695 P.2d 361 (1984); *Lohman v. Morris,* 146 Ill.App.3d 457, 100 Ill.Dec. 263, 497 N.E.2d 143 (1986); *Winterstein v. Wilcom,* 16 Md.App. 130, 293 A.2d 821 (1972); *Lee v. Allied Sports Associates, Inc.,* 349 Mass. 544, 209 N.E.2d 329 (1965); *Malecha v. St. Croix Valley Skydiving Club,* 392 N.W.2d 727 (Minn.App. 1986); *Barnes v. New Hampshire Karting Ass'n, Inc.,* 128 N.H. 102, 509 A.2d 151 (1986); *Theroux v. Kedenburg Racing Association,* 50 Misc.2d 97, 269 N.Y.S.2d 789 (1965), *aff'd,* 28 A.D.2d 960, 282 N.Y.S.2d 930 (1967); *Cain v. Cleveland Parachute Training Center,* 9 Ohio App.3d 27, 457 N.E.2d 1185 (1983); *Huckaby v. Confederate Motor Speedway, Inc.,* 276 S.C. 629, 281 S.E.2d 223 (1981); *Corpus Christi Speedway v. Morton,* 279 S.W.2d 903 (Tex.Civ.App.1955); *Conradt v. Four Star Promotions, Inc.,* 45 Wash.App. 847, 728 P.2d 617 (1986).

undue influence to induce her to sign the release. *Sorensen v. Coast–to–Coast Stores,* 353 N.W.2d 666 (Minn.App.1984). She claims that she signed a "roster" not a release. "At the most, the document may have been innocently misrepresented, which would not have been sufficient to invalidate the release." *Paterek v. 6600 Ltd.,* 186 Mich. App. 445, 465 N.W.2d 342 (1990). No representations outside the contents of the release are alleged. She has failed to establish any of the aforementioned factors and is, thus, bound by the agreement to which she assents. *Sabbagh v. Professional & Business Men's Life Ins. Co.,* 79 S.D. 615, 116 N.W.2d 513 (1962). She did not meet the burden of negating the release. *Gustafson v. Gustafson,* 239 Neb. 448, 476 N.W.2d 819 (1991).

A written release is nothing more than a contract by which the parties consent to a release of an obligation. *Maryland Casualty Co. v. Delzer,* 283 N.W.2d 244 (S.D.1979); *Erck v. Bachand,* 10 N.W.2d 518 (S.D.1943). As such, its interpretation is a question of law. *Butterfield v. Citibank of South Dakota,* 437 N.W.2d 857, 858 (S.D.1989). Johnson had legal capacity to contract. SDCL 53–1–2. Public policy, as well as our State and Federal Constitutions, strongly favors freedom to contract. Did Johnson consent? *Consent is a question of law. Amdahl v. Lowe,* 471 N.W.2d 770 (S.D.1991); *Federal Land Bank v. Houck,* 68 S.D. 449, 4 N.W.2d 213 (1942); *McPherson v. Fargo,* 10 S.D. 611, 74 N.W. 1057 (1898).

She voluntarily entered into a relationship with the Rapid City Softball Association. Her signed release with its broad language provides a complete defense for damages against the defendant except for those due to intentional, willful, or wanton acts. *Seymour v. New Bremen Speedway, Inc.,* 31 Ohio App.2d 141, 287 N.E.2d 111 (1971); *Madison v. Superior Court,* 203 Cal.App.3d 589, 250 Cal.Rptr. 299 (1988). The release need not contain the exact word "negligence" to achieve the intent of the parties. *Douglass v. Skiing Standards, Inc.,* 142 Vt. 634, 459 A.2d 97 (1983).

Indicating that she was unaware of the release language on the form she signed, Johnson insists that she cannot be bound by

the release. Ordinarily, a releasor cannot avoid the effect of a release upon the ground that at the time she signed the paper she did not read it or know its contents. 66 Am. Jur.2d *Release* § 15 (1973). Nonetheless, the State of Washington upheld that rationale in *Baker v. City of Seattle,* 79 Wash.2d 198, 484 P.2d 405, 406–07 (1971), holding that the disclaimer was buried in the middle of the agreement and was not conspicuous.

Not so here. Johnson's release did not have the salient points hidden in fine print or fancy legal jargon. It was highlighted *in red ink* exclaiming: "WARNING—SOFTBALL MAY BE HAZARDOUS TO YOUR HEALTH!!!" The release proclaims, in capital bold letters, **"WE DO HEREBY RELEASE THE R.C. SOFTBALL ASSN, THE R.C. PARKS/REC. DEPARTMENT AND THE CITY OF RAPID CITY FROM ANY AND ALL LOSS *OR INJURY* THAT MIGHT OCCUR WHILE PLAYING IN THE R.C. SOFTBALL ASSN. SANCTIONED PROGRAM."** (Italics added.) Johnson's signature is the fourth complying signature on the page. This was the same form that had been in use for several years according to her coach's deposition. Johnson had played in this league at least three years, thus subject to at least three signings of this release. Her failure to read or understand the legal effect of the release she executed does not abrogate it. *Korsmo,* 435 N.W.2d at 747; *Malecha,* 392 N.W.2d at 731; *Smith v. City of Flint School Dist.,* 264 N.W.2d 368 (1978).

It is implied by Justice Wuest's special writing that Johnson was subject to a contract of adhesion. *Corpus Juris Secundum* defines this as a contract "which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." 17 C.J.S. *Contracts* § 10 (1963); *see Rozeboom v. Northwestern Bell Telephone Co.,* 358 N.W.2d 241, 243–244 (S.D.1984) (a disparity of bargaining power lends to a contract of adhesion). In *Malecha,* 392 N.W.2d at 730, the plaintiff was told if he wanted to skydive, he had to sign the form. Johnson faced the same choice. The contract was upheld because the plaintiff did

not have to participate. Contracts offered on a "take it or leave it" basis are not automatically adhesion contracts. *Green v. Clinic Masters, Inc.*, 272 N.W.2d 813 (S.D.1978); *Milligan v. Big Valley Corp.*, 754 P.2d 1063, 1067 (Wyo.1988); *Clinic Masters v. District Court for County of El Paso*, 192 Colo. 120, 556 P.2d 473, 475 (1976); *St. Paul Fire v. Guardian Alarm Co.*, 115 Mich.App. 278, 320 N.W.2d 244 (1982) (mere fact that a contract is standardized and preprinted does not make it unenforceable as a contract of adhesion).

In exchange for signing the release, Johnson received the right to compete and participate—it is valuable consideration. *Rhea v. Horn–Keen Corp.*, 582 F.Supp. 687 (W.D.Va. 1984); *Seymour*, 287 N.E.2d at 116. Although Johnson would not have been allowed to play softball had she not signed the release, *she was under no compulsion to sign. Schlessman*, 46 Ill.Dec. at 141, 413 N.E.2d at 1254; *LaFrenz v. Lake County Fair Board*, 172 Ind.App. 389, 360 N.E.2d 605 (1977). Johnson was not forced to play softball or play for this particular league.

Courts usually uphold these agreements where there is no disparity in bargaining positions. Stuart M. Speiser et al., *The American Law of Torts*, § 5.39 at 1090 (1983). Such releases are neither unusual nor per se void as a matter of public policy. *American Druggists' Ins. Co. v. Equifax, Inc.*, 505 F.Supp. 66, 68 (S.D.Ohio 1980); *Petersen v. Kemper*, 70 S.D. 427, 18 N.W.2d 294 (1945). In Justice Wuest's writing, he quotes a large paragraph from Speiser's treaty, but, as indicated by the ellipsis, omits a sentence. That missing sentence reads, "Thus, a provision that would exempt its drafter from any liability occasioned by his fault should not compel resort to a magnifying glass and lexicon." Nevertheless, such was done.

As I am of the opinion that this release is valid and the summary judgment was properly granted because there are no genuine issues of material fact concerning the language of the release, I would not reach the issue concerning the recreational use statute. The moving parties were entitled to judgment *as a matter of law.* SDCL 15–6–56(c);

*Wilson v. Great Northern Ry. Co.*, 83 S.D. 207, 157 N.W.2d 19 (1968). "Under both state and federal jurisdictions the rule is identical. When a contract is clear and unambiguous and speaks to a subject it is expected to, there is no need to go beyond the four corners of the contract." *AFSCME Local 1922 v. State*, 444 N.W.2d 10, 12 (S.D. 1989). This individual, a practicing attorney, is attempting to go beyond the four corners of the contract.

Writing for a unanimous Court in *Enchanted World Doll Museum v. Buskohl*, 398 N.W.2d 149, 151 (S.D.1986), Justice Wuest wrote:

> Whether the language of a contract is ambiguous is ordinarily a question of law. (Citation omitted.) The language in a contract may be said to be ambiguous when "it is reasonably capable of being understood in more than one sense." (Citations omitted.)

This release is not ambiguous. It is direct, simple, and cannot be "understood in more than one sense." Johnson's deposition testimony that she did not "recall reading any sort of warning and if [the waiver] was at the bottom [of the form], I didn't read it," is not a defense to the release.

I vote to affirm the summary judgment.

MILLER, C.J., joins this dissent and I am authorized to so state.

