Filed 10/5/23  Valter v. Mammoth Mountain Ski Area CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Mono)

----

| | |
|---|---|
| JOHN VALTER, | C096036 |
| Plaintiff and Appellant, | (Super. Ct. No. CV170111) |
| v. | MODIFICATION OF OPINION AND DENIAL OF PETITION FOR REHEARING |
| MAMMOTH MOUNTAIN SKI AREA, LLC, | |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

Appellant filed a petition for rehearing with this court.  It is hereby ordered that the petition for rehearing is denied.

It is also ordered that the opinion filed herein on September 18, 2023, be modified as follows:

1.      On page 18, at the end of the last paragraph of part II of the Discussion, prior to the Disposition, the following is added as a footnote:

In a petition for rehearing, Valter claims, among other things, that a triable issue of fact exists about whether "the collision occurred at the climber's right side of St. Moritz at its intersection with Stump Alley." (Italics omitted.) He also characterizes this location as around a blind corner. But Valter elsewhere concedes that the unchallenged photographic evidence and more "show that Peters' snowmobile was . . . completely off the St. Moritz run and was entirely on Stump Alley." Valter cannot defeat summary judgment by now disputing these objective facts, for "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (*Scott v. Harris* (2007) 550 U.S. 372, 378-381 [declining to accept a party's characterization of events that conflicted with a video of the same events].)

This modification does not change the judgment.

FOR THE COURT:


_____/s/_____
DUARTE, Acting P. J.



_____/s/_____
BOULWARE EURIE, J.



_____/s/_____
MESIWALA, J.

2

Filed 9/18/23  Valter v. Mammoth Mountain Ski Area CA3 (unmodified opinion)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Mono)

----

| | |
|---|---|
| JOHN VALTER, | C096036 |
| Plaintiff and Appellant, | (Super. Ct. No. CV170111) |
| v. | |
| MAMMOTH MOUNTAIN SKI AREA, LLC, | |
| Defendant and Respondent. | |

Mammoth Mountain Ski Area, LLC, is a ski resort that, like many ski resorts, uses snowmobiles in its operations.  John Valter sued Mammoth after colliding with one of these snowmobiles while skiing.  He alleged that a Mammoth employee improperly drove the snowmobile up the mountain and then stopped in his path.  On Mammoth's motion for summary judgment, the trial court found his claims failed as a matter of law for two reasons.  First, it found Valter's claims barred under the doctrine of primary

1

assumption of risk, reasoning that a collision with a plainly visible snowmobile is a risk inherent in skiing and that Mammoth had not increased this risk. Second, it found Valter's claims barred because he expressly assumed the risk of colliding with a snowmobile when he signed Mammoth's liability waiver. In the waiver, Valter acknowledged the risks of colliding with snowmobiles and excused Mammoth for liability for its negligence.

On appeal, Valter contends neither ground for granting summary judgment is valid. Starting with the doctrine of primary assumption of risk, he asserts the doctrine is inapplicable because the risk of colliding with a snowmobile is not a risk inherent in skiing and, even it were, Mammoth improperly increased this risk. Turning to express assumption of risk, he asserts Mammoth's conduct was grossly negligent and so exceeded the scope of the liability waiver. We limit our discussion to Valter's second argument. Because we conclude the trial court properly granted summary judgment on the ground of express assumption of risk, we affirm on that basis.

BACKGROUND

I

*Factual Background*

Mammoth is a ski resort in Mammoth Lakes. As is common in the ski industry, it uses snowmobiles in its operations and has taken certain steps to reduce the chance of collisions with guests. It has, for instance, created a snowmobile training program and developed training materials that, among other things, require its snowmobile drivers to limit their speed in congested areas, to ride on the side of the run providing the best visibility, to yield to guests, and to use flags and headlights when driving in public areas. It has additionally posted signs at the top of ski lifts warning that snowmobiles "may be encountered at any time," included the same warning in its trail map, and, in its liability waiver for season-pass holders, required season-pass holders to acknowledge that "Skiing

2

and Snowboarding involve risks posed by . . . collisions with . . . snowmobiles and other over-snow vehicles."

Mammoth has also established preferred routes for its snowmobile drivers with the intent to limit collision risks. One of these routes formerly covered two ski runs called St. Moritz and Stump Alley. Stump Alley is a larger, popular run that ends at the base of the resort; St. Moritz is a smaller run that branches off Stump Alley. To provide a rough visualization of these runs, think of a rotated lowercase y—as in, ⅄—with the longer line representing Stump Alley and the shorter line representing St. Moritz. For the designated route covering these runs, snowmobile drivers were instructed to stay to their left when going up St. Moritz; then, where St. Moritz meets Stump Alley, to make a slight right turn onto Stump Alley to avoid a steep area that is difficult for snowmobiles; and then, after passing this area, to travel across Stump Alley and then stay to their left when going up Stump Alley. A map of Mammoth's preferred snowmobile routes shows the St. Moritz-to-Stump Alley route. As depicted in the map, the route crosses Stump Alley at an upward diagonal from right to left and then goes up the left of Stump Alley. Mammoth began developing this route at some time before 1989 and used it until late 2016.

In early 2016, one of Mammoth's lift maintenance employees, Joshua Peters, drove his snowmobile up St. Moritz on his way to a lift maintenance station. Peters— who had completed Mammoth's snowmobile safety training—drove up St. Moritz at about 15 miles per hour, slowed to about five miles per hour before exiting St. Moritz, and then continued at this speed on Stump Alley as he looked to cut across the run. Valter, an expert skier, was skiing down the left side of Stump Alley at the same time and began decelerating from about 30 miles per hour to make a left turn onto St. Moritz. Peters said he saw Valter from a distance of about 80 to 120 feet, slowed further, and then stopped. But Valter never saw Peters. Valter made three or four controlled turns

3

after Peters first saw him, and he then collided with Peters's snowmobile on Stump Alley. Valter suffered significant injuries as a result.

Two other witnesses saw the accident. One was another Mammoth employee who was driving a snowmobile behind Peters. He afterward told an officer that Peters had stopped and that Valter was looking over his left shoulder just before the collision— though Valter told the same officer that he never looked over his shoulder. Another witness saw the accident from above on a ski lift. In a written statement, he said the snowmobile was driving slowly up Stump Alley diagonally from "skier[']s left to right"—as in, from the left side to the right side of the run from the perspective of a skier going downhill. He added that the snowmobile had slowed almost to a stop at the time of impact. But, he wrote, it was "almost as though [the] skier never saw [the] snow mobile"; the skier traveled in a "controlled line but it was directly into [the] snow mobile."

Several photographs taken immediately after the collision show the snowmobile's appearance and position at the time of the accident. The snowmobile is dark blue and flies an orange flag at its back. It is not obstructed by any apparent obstacles. Another photograph taken after the accident, which the parties marked up during Peters's deposition, shows Peters's path from St. Moritz to Stump Alley. Both parties accept that the photograph accurately depicts his path. The photograph (together with other photographs of the scene) shows Peters entered Stump Alley from the far left of St. Moritz near a sign describing different runs and then headed up Stump Alley at a sharp diagonal. According to a diagram that Mammoth personnel made after the accident, the distance between this sign and Peters's snowmobile at the place of the collision was 44 feet.

Before the accident, and as a condition of holding a season pass, Valter signed a liability waiver. In the waiver, Valter agreed he "underst[oo]d Skiing and Snowboarding involve risks posed by . . . collisions with . . . snowmobiles and other over-snow

4

vehicles," "agree[d] that these risks and dangers are necessary to the sports of Skiing and Snowboarding," "AGREE[D] TO EXPRESSLY ASSUME ANY AND ALL RISK OF INJURY OR DEATH which might be associated with [his] participation in the SPORTS," and "AGREE[D] NEVER TO SUE, AND TO RELEASE FROM LIABILITY, Mammoth . . . for any . . . injury . . . which arises in whole or in part out of [his] . . . participation in the SPORTS . . . , including without limitation those claims based on MAMMOTH'S alleged or actual NEGLIGENCE . . . ."

II

*Procedural Background*

Following the accident, Valter sued Mammoth for premises liability and negligence, alleging that Mammoth failed to maintain the ski area in a safe condition and failed to provide adequate warning of the alleged unsafe condition. He reasoned that Peters improperly stopped his snowmobile in front of his path without providing adequate warning.

Mammoth later filed a motion for summary judgment, asserting that Valter's claims failed as a matter of law for two reasons. It contended his claims were barred under the doctrine of primary assumption of risk because a potential collision with a snowmobile is a risk inherent in skiing and it had not unreasonably increased this risk. It also asserted his claims were barred because, in signing the liability waiver, he had expressly agreed to assume the risk of its negligence. Although Mammoth acknowledged that the waiver would not cover its gross negligence, it argued that Valter could not prove gross negligence here.

Valter opposed the motion. To Mammoth's argument concerning primary assumption of risk, he contended snowmobiles have nothing to do with skiing and, even if they did, Mammoth increased the risk inherent in skiing in two ways: first, because Mammoth selected a dangerous snowmobile route, as skiers traveling down the popular Stump Alley run are unable to see snowmobiles traveling up St. Moritz and lack adequate

5

warning of snowmobiles; and second, because Peters dangerously deviated from the snowmobile route when he traveled up the center of St. Moritz and up the right (skier's left) of Stump Alley. To Mammoth's argument concerning express assumption of risk, Valter contended Mammoth's conduct rose to the level of gross negligence and so fell outside the scope of the liability waiver. He reasoned that Mammoth was grossly negligent because it failed to provide adequate warnings about snowmobiles, it chose a dangerous snowmobile route, and Peters dangerously deviated from this route.

The trial court granted Mammoth's motion, agreeing with both of Mammoth's arguments. Starting with the facts, the court found the undisputed facts showed Mammoth warned skiers about the potential risk of colliding with snowmobiles, adopted a snowmobile safety manual, and required training for employees operating snowmobiles. The court further, among other things, found the undisputed facts showed Peters slowed and then stopped on Stump Alley after exiting St. Moritz, Peters's snowmobile was in plain view before the collision on a clear and sunny day, snowmobiles are regularly used at ski resorts, and Valter had expressly agreed to assume the risk of colliding with snowmobiles when he signed a liability waiver for his season pass.

The court then turned to Mammoth's arguments. Beginning with Mammoth's argument grounded on primary assumption of risk, it found a collision with a plainly visible snowmobile is a risk inherent in skiing, adding "that a snowmobile is a commonly used and essential piece of equipment necessary for the practical operation of a ski mountain." It further found Mammoth had not increased this inherent risk. While it accepted that Peters might have deviated from the snowmobile route by several feet, it found this detail immaterial and noted that Peters had attempted to yield to downhill skier traffic on Stump Alley, slowed to five miles per hour as he looked for a safe opportunity to cross, and stopped in a plainly visible location before the collision. Turning to Mammoth's argument premised on express assumption of risk, the court found Valter

6

expressly excused Mammoth for liability for its ordinary negligence.  Although it found the waiver would not excuse Mammoth for liability for gross negligence, it concluded Valter could not show gross negligence here.

After the court entered judgment in Mammoth's favor, Valter timely appealed.

DISCUSSION

I

*Standard of Review*

A trial court may grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc. § 437c, subd. (c).)  To meet its burden on summary judgment, a moving defendant must show either that one or more elements of the plaintiff's causes of action cannot be established or that there is a complete defense to the plaintiff's case.  (*Id.*, subd. (p)(2).)  If the defendant meets this initial burden, the burden then shifts to the plaintiff to show that a triable issue of one or more material facts exists.  (*Ibid.*)  A factual issue is material if it could make a difference in the disposition of the motion.  (Cal. Rules of Court, rule 3.1350(a)(2).)  And a factual issue is triable if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845.)

" ' " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " ' "  (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286.)  We also " 'liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' "  (*Ibid.*)

## II

### *Express Assumption of Risk*

Valter contends neither of the trial court's grounds for granting Mammoth's motion for summary judgment are valid. He first asserts the trial court wrongly granted summary judgment on the ground that the risk of colliding with a snowmobile is an inherent risk of skiing. He reasons that the risk of a snowmobile collision is not an inherent risk of skiing and, even if it were, Mammoth's misconduct increased this risk. He further asserts the court wrongly granted summary judgment on the additional ground that he expressly agreed to assume the risk of Mammoth's negligence, reasoning that Mammoth's conduct was grossly negligent and so exceeded the scope of the agreement. Because we conclude no reasonable person could find Mammoth's conduct rose to the level of gross negligence, we reject Valter's challenge to the latter ground for granting summary judgment and affirm on that basis.

As a condition of receiving a season pass for Mammoth, Valter expressly agreed to assume the risk of Mammoth's negligence. In the context of sports, including for skiing, courts have consistently found these types of agreements are valid when they excuse liability for ordinary negligence—that is, for "a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm." (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 753-754, 759 (*City of Santa Barbara*) ["a number of cases have upheld agreements insofar as they release liability for future *ordinary* negligence in the context of sports and recreation programs"]; see also *Platzer v. Mammoth Mountain Ski Area* (2002) 104 Cal.App.4th 1253, 1259 [finding Mammoth's liability waiver valid].) But our Supreme Court has explained that these agreements generally cannot excuse liability for gross negligence—that is, for conduct evidencing "either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct.' " ' " (*City of Santa Barbara*, at p. 754.)

8

Applying these principles here, we conclude Valter's signing of the liability waiver bars him from suing Mammoth for ordinary negligence—which Valter does not dispute. We further conclude Valter cannot show Mammoth's conduct rose to the level of gross negligence. The undisputed facts show, among other things, that snowmobiles are common at ski resorts, that Mammoth posted signs warning guests that snowmobiles could be encountered at any time, that Valter expressly acknowledged the risk of colliding with a snowmobile and agreed to assume the risk of Mammoth's negligence, that Mammoth trained Peters on snowmobile safety, that Peters drove his snowmobile slowly and stopped or almost stopped before the collision, that his snowmobile flew an orange flag, and that, in the photographs taken immediately after the accident, no obstacles are shown obstructing a downhill skier's ability to see Peters and his snowmobile in the area of the collision. Considering the undisputed facts here, we conclude that Mammoth met its burden to show that it is entitled to judgment on the ground of express assumption of risk. We also conclude that Valter has failed to raise any triable issue of material fact to preclude summary judgment. (See *Joshi v. Fitness Internat., LLC* (2022) 80 Cal.App.5th 814, 828 ["although the existence of gross negligence is a matter generally for the trier of fact [citation], it may be determined as a matter of law on summary judgment in an appropriate case"].)

Although Valter argues Mammoth's conduct here could be found grossly negligent for several reasons, we find none of his arguments persuasive. He first contends Mammoth could be found grossly negligent because the presence of snowmobiles is not an inherent part of skiing. But whether or not the presence of snowmobiles is an inherent part of skiing, we are at least satisfied that no reasonable person could find Mammoth grossly negligent simply because it used snowmobiles. The undisputed facts, again, show that snowmobiles are common at ski resorts. Mammoth's former health and safety manager, for instance, explained that in the ski industry, snowmobiles are used "on a daily basis for lift maintenance, lift operations, and for ski

9

patrol emergency transport." Valter, who said he had skied about a 1,000 days in his lifetime on various mountains, never alleged differently. He instead acknowledged he commonly saw snowmobiles on ski runs that were open to the public. The undisputed facts, moreover, show that a ski resort's use of snowmobiles can improve safety. Snowmobiles, for example, allow lift maintenance technicians (like Peters) to respond quickly when a chair lift maintenance safety issue arises that requires an immediate response. Again, Valter never alleged differently and, on appeal, states he does not disagree "that snowmobiles are very useful and efficient in the operation of a ski resort." On these undisputed facts, we cannot say that Mammoth's decision to use snowmobiles evidenced "either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct,' " ' " even though, as Valter asserts elsewhere in his brief, snowmobiles (like most, if not all, snow equipment) pose some potential risk to skiers. (*City of Santa Barbara, supra*, 41 Cal.4th at p. 754.)

Second, Valter suggests Mammoth could be found grossly negligent because it never shared its designated snowmobile routes with its guests. But Mammoth repeatedly cautioned guests about snowmobiles and explained they could be encountered at any time. Signs at the top of the lifts at Mammoth, for instance, explain that snowmobiles "may be encountered at any time." The Mammoth trail map says the same: Snowmobiles "may be encountered at any time." And the liability waiver that Valter signed further warned about the presence of snowmobiles and the risk of collisions, stating that Valter "underst[oo]d Skiing and Snowboarding involve risks posed by . . . collisions with . . . snowmobiles and other over-snow vehicles." Even Valter agreed "Mammoth provide[d] [him] a warning that [he] may encounter snowmobiles," though he said Mammoth never mentioned moving snowmobiles. Considering the undisputed facts on this topic, we accept that Valter would have had more information about the potential for encountering snowmobiles had Mammoth shared its snowmobile routes with its guests. But we conclude no reasonable person could find Mammoth grossly negligent

10

simply because it failed to share these maps—a practice that no ski resort, as far as Valter has shown, has adopted.  (See *Brown v. El Dorado Union High School Dist.* (2022) 76 Cal.App.5th 1003, 1028-1030 [no gross negligence as a matter of law, in a case involving a student's concussion playing football, even though the school district "could have done more to educate students and family" about concussions].)

Third, Valter argues Mammoth could be found grossly negligent because Peters failed to follow Mammoth's preferred snowmobile route for St. Moritz.  According to the preferred snowmobile route, again, Peters should have stayed to his left when going up St. Moritz; then, where St. Moritz meets Stump Alley, made a slight right onto Stump Alley to avoid a steep area that is difficult for snowmobiles; and then, after passing this area, traveled across Stump Alley and up the left side of Stump Alley.  But according to Valter, Peters instead "drove up near the middle of St. Moritz" (rather than the left), "made a looping right turn near the top of St. Moritz at its intersection with Stump Alley" (rather than a slight right), and "intend[ed] to drive up the right side of Stump Alley" (rather than drive across Stump Alley and up the left side of the run).  As a result, Valter asserts, Peters was "several yards from where he was supposed to be before trying to cross Stump Alley" at the time of the accident.

But much of Valter's alleged facts lack evidentiary support.  He claims Peters "intend[ed] to drive up the right side of Stump Alley" based on the statements of an officer who spoke with Peters after the accident.  But according to the officer, Peters characterized his route *before* the accident, not the route he intended to follow afterward. Valter further claims Peters ended up several yards off the snowmobile route.  But he cites nothing in support and appears to rely only on speculation.  He also cites a photograph to show Peters drove near the middle of St. Moritz.  But the cited photograph shows Peters's route along the left side of St. Moritz.  Valter appears to characterize the photograph differently because it shows open snow to the left on part of Peters's path. But as the Mammoth trail map and snowmobile route map show, snowmobile drivers

11

going up St. Moritz will—even if they stay to their far left on St. Moritz—have open snow to their left as they approach Stump Alley. This area, however, is not part of St. Moritz. It is instead part of a different run, Patrolmen's, that branches off St. Moritz immediately after St. Moritz branches off Stump Alley. As the photograph of Peters's path shows, moreover, because of trees, Peters could not have driven farther to the left at the point where St. Moritz meets Stump Alley.

In any event, even if Peters deviated from the snowmobile route and ended up "several yards" off the route, we find no reasonable person could find his conduct demonstrated gross negligence. Even assuming that Peters's driving left him somewhat off the designated route, the undisputed facts still show he exercised a degree of caution: He traveled slowly up the mountain, reduced his speed to five miles per hour as he exited St. Moritz, continued at five miles per hour on Stump Alley, and, after seeing Valter, slowed further and either stopped or almost stopped. Valter does not dispute these facts. The photograph depicting Peters's path, moreover, shows, if nothing else, that Peters could not have driven farther to the left at the point where St. Moritz meets Stump Alley. And photographs taken immediately after the collision show that Peters's snowmobile flew an orange flag and that no apparent obstacle obstructed a downhill skier's ability to see Peters and his snowmobile while on Stump Alley. On these undisputed facts, we conclude no reasonable person could find that Peters's conduct evidenced either a want of even scant care or an extreme departure from the ordinary standard of conduct, even if, as Valter asserts, Peters was "several yards" off the designated route at the time of the collision.

We find that true even though Valter suggests that Mammoth could be found grossly negligent even if Peters were "mere inches" off the designated route. Valter bases his point on our court's opinion in *Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546. In that case, a gym deliberately placed a piece of exercise equipment less than four feet behind a treadmill, even though it knew the treadmill

manufacturer's manual said to provide a minimum six-foot clearance behind the treadmill for user safety. (*Id.* at pp. 549, 551, 558.) A gym member later sued the gym for negligence after falling off the treadmill and hitting her head on the equipment behind it. (*Id.* at pp. 548-549.) But the trial court found her claims failed as a matter of law on summary judgment, reasoning that the gym member had signed a liability waiver and the gym's conduct could not constitute gross negligence. (*Id.* at p. 553.) On appeal, we reversed. We found a jury reasonably could find the facts demonstrated gross negligence, including by finding that it is standard practice in the industry to provide a minimum six-foot safety zone behind treadmills, that the gym failed to follow this standard practice to accommodate more members to make more money, that the gym took no mitigation measures, and that, as an expert implied, the gym's failure to provide the standard safety zone was an extreme departure from the ordinary standard of conduct. (*Id.* at pp. 557-558, 567.)

Attempting to apply *Jimenez*'s reasoning here, Valter suggests that if "mere inches" could support a claim of gross negligence in that case, then surely several yards could support a claim of gross negligence here. We find differently. To start, as noted, Valter cites no facts showing that Peters was several yards off the designated route at the time of the accident. But even setting that aside, we find *Jimenez* is distinguishable on several levels. First, unlike the plaintiff there, Valter cites no expert opinion suggesting that a "mere inches" deviation—or even a "several yards" deviation—from a designated snowmobile path is an extreme departure from the ordinary standard of conduct. And second, unlike the defendant in *Jimenez*, Mammoth implemented various safety precautions to limit collision risks, including by warning guests about snowmobiles, training snowmobile operators, and using designated snowmobile routes. We find *Jimenez* of limited help to Valter for these reasons.

Next, Valter asserts Mammoth could be found grossly negligent in using St. Moritz as one of its designated snowmobile routes. He reasons that Mammoth should

have chosen a different route because it knew Stump Alley was a popular run, knew skiers "coming down Stump Alley 'hug' the tree line on the left in order to turn left onto St. Moritz," acknowledged that these trees would have grown substantially since the snowmobile routes were initially established around 1989, knew snowmobiles on St. Moritz pose a potential danger to skiers, knew other routes were available, and never conducted any safety, feasibility, or visibility studies for the route. He adds that Mammoth's new snowmobile routes no longer use St. Moritz (though he says the "change was not made in response to Valter's injury") and that Mammoth now uses snowmobile corridors that are marked off with stakes and ropes.

But although we accept that Mammoth could have taken more precautions to ensure skier safety before Valter's injury, its failure to do so cannot support a claim for gross negligence here. Mammoth, again, had taken several steps to limit potential collisions on St. Moritz before Valter's injury, including warning guests about snowmobiles, requiring training for its snowmobile drivers, and requiring these drivers to yield to guests, to fly an orange flag and use headlights, and to stay to their left while driving up St. Moritz—which would place them on the opposite side of the run from skiers who were (as Valter puts it) hugging the tree line coming down Stump Alley to St. Moritz. And while Valter claims Mammoth should have used a route other than St. Moritz, he has not shown, or even alleged, that any alternate route would have been safer.

Nor has Valter shown that Mammoth's process for selecting St. Moritz as one of its snowmobile routes was inadequate. Mammoth may not have conducted formal studies about the use of St. Moritz, but its personnel still considered potential routes that would, in their view, maximize safety and then tested their conclusions about best routes. For the St. Moritz-to-Stump Alley route, for example, Mammoth personnel skied down Stump Alley while a snowmobile was on St. Moritz and "determined that it was very easy to see the snowmobile." And in the decades before Valter's injury, nothing in the record shows the use of St. Moritz harmed a single skier or snowboarder. Indeed, the

14

record shows only one other snowmobile collision in the previous 40 years at Mammoth, with the other collision occurring on a hill after a beginner skier lost control and hit a ski school's snowmobile.

Mammoth, to be sure, could have taken even more precautions to ensure skier safety before Valter's injury. As Valter notes, for example, Mammoth could have enhanced safety further through the earlier adoption of snowmobile corridors. But he cites not one ski resort that used snowmobile corridors before the time of his injury, and we find this limited consideration insufficient to support a potential claim for gross negligence. Considering the undisputed facts here, we conclude no reasonable juror could find Mammoth's use of St. Moritz in its snowmobile route evidenced either a want of even scant care or an extreme departure from the ordinary standard of conduct. And we find that so even though we accept, as Valter argues, that Mammoth did not pursue all possible options for limiting collision risks. (See *Decker v. City of Imperial Beach* (1989) 209 Cal.App.3d 349, 361 [no gross negligence as a matter of law even though the city did not "pursue all possible options" when attempting to save a swimmer].)

Lastly, Valter contends several triable issues of material fact preclude summary judgment. He starts with the visibility of the snowmobile. He asserts Peters's deviation from the route and failure to be "at the left side of St. Moritz when he reached the top of that run" endangered skiers "turning left around a blind corner onto St. Moritz." Explaining the blind corner, he states a skier coming down Stump Alley cannot see "down much of St. Moritz" because of the angle at which St. Moritz meets Stump Alley, trees, and other obstacles. He adds that Peters's snowmobile was dark blue and so could be "easily lost in the shadows covering the run [St. Moritz] at the time."

But Valter's allegations cannot be squared with the undisputed facts. Although Valter claims Peters failed to be at the left side of St. Moritz at the top of that run, the photograph showing Peters's route—which Valter relies on—shows Peters could not have been farther to the left at that location. Although Valter further claims Peters's

15

snowmobile could have been lost in the shadows present at the time, the photograph he cites purportedly showing these shadows shows clear skies and white snow, with the only shadow depicted being the photographer's own. And although Valter notes some obstacles may prevent a skier from seeing "down much of St. Moritz" while coming down Stump Alley, Peters's snowmobile was not on St. Moritz at the time of the accident. Nor was it "coming around a blind corner when it struck him," as Valter repeatedly asserts in his reply brief. The photograph of Peters's route, again, shows Peters entered Stump Alley from the far left of St. Moritz and then traveled up Stump Alley before the accident. Other photographs show Peters's snowmobile was on Stump Alley at the time of the accident and not obstructed by any apparent obstacles. And all witnesses who described Peters's speed explained that he traveled slowly up Stump Alley and then stopped or almost stopped before Valter skied into him. Valter has failed to show a triable issue of material fact in these circumstances.

Nor are we persuaded to find differently merely because, as Valter notes, snowmobiles are not as loud and massive as certain other snow equipment—namely, snowcats. Valter discusses snowcats in an attempt to distinguish our court's earlier decision in *Willhide-Michiulis v. Mammoth Mountain Ski Area, LLC* (2018) 25 Cal.App.5th 344, a case involving a skier who was injured after colliding with a snowcat that was 30 feet long and 18 feet wide and had a safety beacon, warning lights, and an audible alarm. (*Id.* at pp. 348, 362.) Although the snowcat in that case turned without using a turn signal before the collision, we ultimately found other warnings about the snowcat's presence (including the snowcat's large size and loud sound) barred the skier from claiming that Mammoth was grossly negligent as a matter of law. (*Id.* at p. 363.) Attempting to distinguish the case, Valter asserts a snowmobile is not as obvious as a snowcat. But while that is true, our standard is not whether a snowmobile is comparable to a snowcat. And on the undisputed facts here—which, among other things, show that snowmobiles are common at ski resorts, that Peters drove his snowmobile slowly and

16

stopped (or almost stopped) before the collision, that the snowmobile flew an orange flag, and that no apparent obstacle obstructed a downhill skier's ability to see Peters and his snowmobile on Stump Alley—we conclude that no reasonable person could find Mammoth grossly negligent.

Valter alternatively, in his reply brief, argues he lacked sufficient time to avoid Peters even if Peters and his snowmobile were plainly visible. That is so, he reasons, because he was skiing at about 30 miles per hour (or about 44 feet per second)[1] and Peters testified that he saw Valter when he was about 80 to 120 feet away—which would mean Valter only had two to three seconds to adjust to avoid Peters. But Valter fails to account for several facts that undercut his argument. First, in his own telling, he was traveling at a speed less than 30 miles per hour, as he was decelerating from 30 miles per hour at the time of the collision. And second, according to Peters's undisputed testimony, Valter managed to make three or four controlled turns after Peters saw him— demonstrating that the issue is more that Valter failed to notice Peters than that he lacked time to avoid Peters. At any rate, because Valter raised this argument for the first time in his reply brief, and without good cause, we find the argument forfeited. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

In the end, none of Valter's arguments—whether considered individually or collectively—potentially show Mammoth was grossly negligent. Again, we accept that snowmobiles (like most, if not all, snow equipment) pose some potential risk to skiers. We accept too that Mammoth could have done more to protect skiers from potential snowmobile collisions. But the question is not simply whether a reasonable person could find that Mammoth could have done more. Of course it could have. And no matter the precautions Mammoth implements, someone could always imagine some additional precaution or some additional study that could prove helpful. But that is not the relevant

---

[1] One mile is 5,280 feet. Someone traveling 30 miles per hour is traveling 158,400 feet per hour, 2,640 feet per minute, and 44 feet per second.

17

inquiry. It is instead whether a reasonable person could find that Mammoth's conduct demonstrated "either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct.' " " ' (*City of Santa Barbara, supra*, 41 Cal.4th at p. 753.) And on this question, we find the answer is no as a matter of law. (See *Willhide-Michiulis v. Mammoth Mountain Ski Area, LLC, supra*, 25 Cal.App.5th at pp. 363-365 [no gross negligence as a matter of law even though the snowcat operator failed to use a turn signal before turning]; *Brown v. El Dorado Union High School Dist., supra*, 76 Cal.App.5th at p. 1030 [no gross negligence as a matter of law even though the school district "could have done more"]; *Decker v. City of Imperial Beach, supra*, 209 Cal.App.3d at p. 361 [no gross negligence as a matter of law even though the city did not "pursue all possible options"].)

## DISPOSITION

The judgment is affirmed. Mammoth is entitled to recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

/s/
BOULWARE EURIE, J.

We concur:

/s/
DUARTE, Acting P. J.

/s/
MESIWALA, J.

18